## WILLIAM B. LYMER, ATTORNEY GENERAL OF THE TERRITORY OF HAWAII, *v.* JONAH KUMALAE.

### No. 1692.

APPEAL FROM CIRCUIT JUDGE FIRST CIRCUIT.
HON. C. F. PARSONS, JUDGE.

ARGUED JULY 6, 7, 1926.                    DECIDED JULY 30, 1926.

PERRY, C. J., LINDSAY AND BANKS, JJ.

QUO WARRANTO—*burden of proof.*

In a proceeding in *quo warranto* brought to determine the title of one claiming a public office, the burden is on the respondent to establish his legal title to such office.

FINDINGS OF FACT BY CIRCUIT JUDGE—*weight given.*

A finding of fact made by a circuit judge upon conflicting testimony is entitled to great weight in this court.

MUNICIPAL GOVERNMENT—*office of supervisor—vacancies.*

By statutory provision, when a vacancy occurs in the office of supervisor of the City and County of Honolulu, it can only be filled by appointment by the mayor, which appointment must be confirmed by the board of supervisors.

Opinion of the Court.

SAME.

When the mayor appoints someone to fill such vacancy and at a meeting of the board at which five supervisors are present a motion is made to confirm the appointment, it is illegal to record a member as voting in the affirmative who has absented himself from the meeting before his name is called on the motion to confirm and who is not present when his name is called.

SAME.

Under such circumstances when two of the members present vote in the affirmative and three members who were absent when their names were called are recorded as voting in the affirmative, there is no confirmation and the mayor's appointee acquires no title to the office.

SAME—*de facto officers.*

When under such circumstances an attempt is thus made to fill two vacancies on the board of supervisors and the persons attempted to be confirmed are declared by the mayor to have been confirmed and thereafter take oath of office and file bonds and attend and participate in the proceedings of the board, they are not as to each other *de facto* officers if each of them knows that the other has not been legally confirmed.

SAME.

If at a subsequent meeting of the board a motion is made to reconfirm one of such appointees who knows that the other appointee has not been legally confirmed, the latter is disqualified to vote on said motion and cannot by his vote confer a legal title to the office of supervisor upon the former.

SAME—*quorum.*

Such appointee, being disqualified to vote on the motion to confirm the other appointee, cannot be counted in determining whether a quorum is present for the purpose of considering said motion.

STATUTES—*quorum.*

The statutes of Hawaii require that the board of supervisors of the City and County of Honolulu shall consist of seven members and a quorum shall consist of a majority of all the members of the board. Under these statutes a majority of all the members required by law to constitute the board, and not a majority of the members actually in office at a given time, is necessary to a quorum.

This is a proceeding in *quo warranto*. On March 1, 1926, William B. Lymer, as attorney general of the Territory, filed in the circuit court a verified petition in which the legal right of the respondent, Jonah Kumalae, to hold the office of supervisor of the City and County of Honolulu was challenged. On the same day the petition was filed the writ of *quo warranto* was issued by the order of Honorable Frank Andrade, circuit judge, and was made returnable on the 5th day of March, 1926. Service was had on the respondent on the day the writ was issued. On the 6th day of March, 1926, the respondent filed his verified answer. There being no demurrer either to the petition or the answer it is not necessary to set them out *in extenso*. The following statutory provisions and material facts are admitted by the pleadings. The board of supervisors of the City and County of Honolulu is required by statute to be composed of seven members. The mayor is designated by law as the presiding officer of said board but is not a member of it. John H. Wilson was the mayor of the City and County of Honolulu at the time the petition was filed and at all times mentioned therein. On the 8th day of October, 1925, William H. McClellan, who was then a member of the board, tendered his resignation which was accepted on October 13, 1925. On the 29th day of December, 1925, Lester Petrie, who was then a member of the board, tendered his resignation which was accepted on January 4, 1926. There were then left, as members of the board, Ben Hollinger, Albert R. Cunha, William Ahia, John Effinger and Albion Clark. The resignations of McClellan and Petrie left two vacancies which the mayor, with the approval of the board, was empowered by statute to fill by appointment. On the 22d day of January, 1926, at a regular meeting of the board the mayor submitted the name of Jonah Kumalae, the respondent, to fill the vacancy caused by the resigna-

tion of William H. McClellan. It also appears from the
evidence that at the same meeting of the board at which
the name of the respondent was submitted the mayor also
submitted the name of Kim Ak Ching to fill the vacancy
caused by the resignation of Lester Petrie. It also ap-
pears from the evidence that on the 18th day of February,
1926, Jonah Kumalae took the oath of office as a super-
visor of the City and County of Honolulu and on the same
date filed a bond as required by law. On the 20th day
of February, 1926, Kim Ak Ching likewise took the oath
of office as a supervisor and on the same date filed a bond
as required by law. This brief outline of the case brings
us to the cardinal question involved in the appeal, namely,
whether the respondent has been legally appointed to the
office which the petitioner alleges he has usurped and now
occupies without legal authority. The court below prop-
erly held on the issues presented that the burden rested
on the respondent to establish his legal title. After a
protracted trial and the adduction of much testimony the
circuit judge rendered judgment against the respondent.
From this judgment the present appeal is taken.

The respondent claims that his nomination by the
mayor was twice confirmed by the board of supervisors;
once at a meeting held on February 16, 1926, and again
at a meeting held on March 2, 1926. If his confirmation
was legally accomplished at either of these meetings he
is a *de jure* supervisor and entitled to serve as such. On
the other hand, if he was not legally confirmed at either
of these meetings he is not a supervisor and the judgment
of the lower court should be affirmed.

We will consider these two meetings and their results,
so far as they affect the instant case, in their order. At
the inception of the meeting held on February 16 there
were present supervisors Ahia, Clark, Cunha, Effinger and
Hollinger—the entire board as it then existed. John H.

Wilson, the mayor, was the presiding officer and Leon K. Sterling, a deputy of the city and county clerk, was serving as clerk. Supervisor Clark made a motion that the confirmation of Kumalae and Ching be taken up and also a motion that their nominations be confirmed. These motions were seconded by Supervisor Effinger. The order in which they were made is not clear and it is not material. Upon the call of the roll of supervisors on the motion to confirm Kumalae and Ching, Clark and Effinger voted in the affirmative. When the names of supervisors Ahia, Cunha and Hollinger were called none of them responded. The mayor ordered the vote of each of them to be recorded in the affirmative and declared Kumalae and Ching duly appointed. Did the mayor have the authority to order the votes of Ahia, Cunha and Hollinger to be recorded in the affirmative? If he had such authority his exercise of it was just as effective as though these supervisors had themselves voted. If he had not this authority his assumption of it would be entirely unavailing. It is claimed by the respondent that this authority is conferred by Rule 7 of section 23 of the rules of procedure of the board of supervisors. This rule is as follows: "If any member refused to vote after having been ordered to do so, if the board does not by further vote order him to be punished, then his vote shall be recorded as on the affirmative side of the particular question on which he refused to vote." This rule provides two methods of dealing with a member who refuses to vote on a pending question. One is to punish him if the board so orders or if this method is not adopted his vote shall be recorded in the affirmative. There is no claim that the first method was adopted at the meeting of February 16. It is claimed, however, that the alternative method was adopted. Let it be conceded for the sake of argument that it was adopted and the votes of Ahia, Cunha and Hollinger were

recorded in favor of the confirmation of Kumalae and Ching, the question still remains, was this course authorized by Rule 7. Under this rule it is indispensable to the mayor's authority to record in the affirmative the vote of a member of the board who refuses to vote that he first be ordered to vote. It is upon his refusal to obey such order that the authority to record his vote in the affirmative depends. Whether the consequences of his failure to obey the order can lawfully be visited upon him depends on whether he was present when the order was given. It would be an absurdity to say that one must suffer the consequences of a failure to obey an order about which he knew nothing. Moreover, before the mayor can rightfully record in the affirmative the vote of a member of the board who refuses to vote, the order to vote must be given at the time he is called upon to vote on the pending question. Rule 1, section 23, in rules of procedure provides as follows: "There shall be three methods of ascertaining the decision of the board upon any matter; first, by raising of hands, which shall be the usual and ordinary method; second, by rising; and third, by call of the roll of members, and a record made by the clerk of the vote of each member." At the meeting of February 16, when the question of the confirmation of Kumalae and Ching was presented, the method of voting adopted was that of calling the roll. Under this procedure no member can be required to vote until his name is called. If, being present when his name is called, he does not vote and is ordered to do so and refuses, his vote may then, under Rule 7, be recorded in the affirmative. It will not suffice to place him in default to warn him in advance that unless he remains at the meeting and votes when called upon to do so his vote will be recorded in the affirmative. Rule 7 confers no such authority. Its terms are explicit that "if any member refused to vote

after having been ordered to do so  *  *  *  then his vote shall be recorded as on the affirmative side of the particular question on which he refused to vote." Under what circumstances then did this rule authorize the votes of Ahia, Cunha and Hollinger to be recorded in favor of the confirmation of Kumalae and Ching? The answer is plain. Each of these members whose vote was so recorded must have been ordered to vote when and not before his name was called and he must of course have been present when the order was given. A mere warning uttered beforehand that if he did not vote when his name was called his vote would be recorded in the affirmative would in no sense be the equivalent of an order to vote given when his name was called and he refuses to respond. A member might disregard the warning and leave the meeting, but if present when the order to vote is given feel obliged to obey it. Again, a warning given to a member before his name is called, that if he does not vote when his name is called the consequences of his failure to vote will be visited upon him, if sufficient to authorize the recordation of his vote in the affirmative would be just as effective if given an hour before his vote is called for as if given a few moments before—which would hardly be claimed. In what form the order to vote shall be given or by whom is not apparent from Rule 7. The evidence shows that no such order was given to Ahia, Cunha or Hollinger, unless the calling of their names on the motion to confirm Kumalae and Ching constituted an order. Whether this is the kind of order contemplated by Rule 7 we need not decide. Assuming that it is, there is ample evidence in the record to show that neither Ahia, Cunha nor Hollinger was present when his name was called on this motion. This, as we have already observed, was fatal to the right to record their votes in the affirmative. There was much conflict in the evidence as to the

whereabouts of Ahia, Cunha and Hollinger when the name
of each of them was called on the motion to confirm Ku-
malae and Ching.  The meeting was turbulent.  There
was considerable confusion.  Several motions were made
and seconded and debated.  A motion to confirm Kumalae
and Ching—a motion to defer action—motions to adjourn
were made in rapid succession.  The mayor ruled all of
them out of order except the motion to confirm.  Finally
the confusion became so great that Sterling, the acting
clerk, after admonishing the mayor, "Go find yourself
a clerk," left the assembly room and thereupon the mayor
designated Albion Clark, one of the supervisors, to act
as clerk *pro tem.* and instructed him to call the roll on
the motion to confirm Kumalae and Ching.  On the call of
the roll by Clark, Effinger and Clark voted in the affirma-
tive.  Neither Ahia, Cunha nor Hollinger was present and
consequently did not vote and their votes were by direc-
tion of the mayor recorded in the affirmative.  After hear-
ing the testimony of many witnesses, seeing them face to
face, observing their demeanor, familiarizing himself with
their motives, their bias, political or otherwise, and their
desire to see one side or the other prevail in the suit, the
circuit judge decided that neither Ahia, Cunha nor Hol-
linger was present at the meeting when his name was
called on the motion to confirm Kumalae and Ching.  In
a very admirable decision, after fully reviewing the evi-
dence on this phase of the case, the circuit judge said:
"In view of the facts above recited the court holds that
the respondents have not sustained the burden of proving
by a preponderance of the evidence that supervisors Hol-
linger, Cunha and Ahia, or any one or more of them, were
present at the supervisors' meeting of February 16, 1926,
above referred to, when their names were called upon
Supervisor Clark's motion to confirm the appointments of
Messrs. Kumalae and Ching; and for the reasons above

set forth the court finds affirmatively as material facts in the case that they were not so present, at that time, and that their votes were cast by another or others than themselves without their knowledge or consent." This court indulges the presumption that this finding of fact by the court below is correct. It is true we have the power, and indeed it would be our duty, if the evidence requires it to reach a different conclusion. After a careful study of the record, however, we are of the opinion that the finding of the circuit judge is fully supported by the evidence. It is contended, however, by the respondent that the circuit judge only found that Ahia, Cunha and Hollinger were not in the assembly room when their names were called and did not find that they were not in the vicinity. We think the finding of the circuit judge is not susceptible of this literal and limited construction. The finding was that neither Hollinger, Cunha nor Ahia was present at the meeting in question when his name was called upon the motion to confirm the appointments of Kumalae and Ching and that their votes were cast in the affirmative without their knowledge or consent. This is clearly a finding that none of these supervisors was either in the assembly room or so near it as to warrant the mayor or the clerk to cast his vote in the affirmative. It may be that a supervisor, who is not actually in the room where the meeting is being held but who is in such close proximity to it that he is in view of the presiding officer and can hear his name when it is called, by a refusal to vote places himself in such default that he may either be punished or voted in the affirmative. This is not the question before us and we express no opinion on it. When Ahia, Cunha and Hollinger absented themselves from the meeting of the board there were left of the supervisors only Clark and Effinger. They were not sufficient to constitute a quorum and therefore their action in favor of

the confirmation of Kumalae and Ching was ineffectual to confer upon either of them a legal title to the office of supervisor of the City and County of Honolulu.

The next meeting of the board of supervisors following the meeting of February 16 was held on February 23, 1926. At this meeting there were present supervisors Ahia, Clark, Cunha, Effinger and Hollinger. Kumalae and Ching also attended and participated in the proceedings. There is only one feature of this meeting that is pertinent to the instant case. This feature is the presentation to the board for its action of a certain record or memorandum made by Supervisor Clark who acted as clerk *pro tem.* during a part of the previous meeting of February 16. A motion was made and seconded at the meeting of February 23 to approve this record. On this motion Clark, Effinger, Kumalae and Ching voted in the affirmative and Ahia, Cunha and Hollinger voted in the negative. The motion was declared carried and the record was declared approved. It is claimed by the respondent that the board is required by statute to keep a journal of its proceedings. This is beyond dispute. Section 1725, R. L. 1925, imposes certain duties on the board of supervisors of the City and County of Honolulu and among these duties is that of keeping "a journal of its proceedings." It is also claimed by the respondent that the record of the proceedings of the board when approved by the board itself imports absolute verity and cannot be collaterally attacked. There is much authority to support this contention and it is perhaps sound. It presupposes, however, *a meeting of the board.* For instance, if a number of supervisors less than a quorum should assemble and transact business that only the board could transact there would, of course, be no meeting of the board and a record of their proceedings would have no value as an official record. It is a record of the pro-

ceedings *of the board of supervisors* that the statute requires to be kept and not a record of the proceedings of a number of its members less than a quorum. When the very question at issue, as in the present case, is whether there was a meeting of the board, in other words, whether there was a quorum present when Ahia, Cunha and Hollinger were called on to vote on the motion to confirm Kumalae and Ching, can it be that the memorandum made by Clark is conclusive of the essential fact on which its quality as an official record depends? It is true that at the beginning of the meeting of February 16 there were present all the existing members of the board. The record kept of the proceedings during the time a quorum remained present is official and entitled to all of the respect accorded records kept in obedience to law. When Ahia, Cunha and Hollinger absented themselves from the meeting there was no longer a quorum present and, consequently, no longer a *meeting of the board*. The record therefore made by Clark of what transpired after the quorum was destroyed was nothing more than a private memorandum and even if it was approved as minutes at the subsequent meeting of the board held on February 23, which we do not now decide, would still remain without validity as an official record. Even considered as evidence of the whereabouts of Ahia, Cunha and Hollinger when their names were called on the motion to confirm Kumalae and Ching on February 16, the Clark memorandum is entirely lacking in probative force. It is as follows:

"Record of a portion of the proceedings of a meeting of the Board of Supervisors of the City and County of Honolulu, held at the City Hall in Honolulu, February 16th 1926.

"The said meeting having been previously called to order by Mayor John H. Wilson, the presiding officer of the said Board.

"At the time the meeting was called to order, the following named Supervisors were present and answered to the call of the roll;

"William Ahia, A. F. Clark, A. R. Cunha, John Effinger and Ben Hollinger, the above named Supervisors constituting a quorum of the Board.

"During the progress of said meeting of February 16th, and after a great deal of routine business had been passed upon, Supervisor Albion F. Clark obtained the privilege of the floor and after being duly recognized by the Mayor, made the following motion:—

" 'That this Board of Supervisors do now ratify and confirm the appointments of Mr. Kumalae and Kim Ah Ching as Supervisors, to fill the vacancies now existing on the Board of Supervisors, these two names having been presented to the Board several weeks ago by the Mayor.'

"This motion was duly seconded by Supervisor John Effinger.

"The Mayor put this motion before the meeting and instructed the Clerk to call the Roll on the motion, but before final disposition of same had been taken, Supervisors Cunha, Hollinger and Ahia absented themselves from their seats, the Clerk of the Board doing likewise; The Mayor called to them to keep their seats the meeting not having been adjourned, but no attention was paid to the request of the Mayor, the Clerk remarking as he left his seat 'Get a Clerk of your own.'

"Supervisors Clark and Effinger remaining in their seats, the Mayor announced that the meeting had not adjourned and was still in session, and further that the motion to confirm Kumalae and Ching was still before the meeting for action.

"The Mayor then asked Supervisor Albion Clark to act as Clerk pro tem, and to call the names of the Supervisors on the pending motion to confirm the names of Kumalae and Ching, and also to make a note that Supervisors Cunha, Hollinger and Ahia had voted in the affirmative.

"Supervisor Clark then called the names of the Supervisors on the motion to confirm.

"William Ahia, Aye, (by the Mayor)
A. R. Cunha, Aye, (by the Mayor)
Ben Hollinger, Aye, (by the Mayor)
John Effinger, Aye, Albion F. Clark, Aye.

"The Mayor declared the motion carried in the affirmative, and proclaimed Jonah Kumalae and Kim Ah Ching as duly confirmed Supervisors to fill the vacancies on the Board.

"Supervisor Clark then moved, seconded by Supervisor Effinger that the meeting stand adjourned to February 23rd 1926, at 1.30 P. M.

"The motion carried.

"The foregoing is a true record of the final proceedings of the meeting of the Board of Supervisors Held February 16th 1926."

It will be observed that the memorandum nowhere recites that Ahia, Cunha or Hollinger was present when his name was called on the motion to confirm, on the contrary, its recitals indicate that none of them was present.

We come next to the meeting of the board held on March 2, 1926. As we have already observed the respondent claims that at this meeting his nomination was again confirmed. At the inception of this meeting there were present of the regular supervisors, Clark, Cunha and Effinger. Kumalae and Ching were also present and participated in the proceedings. John H. Wilson, the mayor, presided at the meeting and David Kalauokalani, clerk of the city and county, was clerk of the meeting. A motion to reconfirm the nomination of Kumalae as a supervisor was made by Supervisor Clark and seconded by Supervisor Effinger. When the motion was put to a vote the ayes and noes were called. Supervisors Clark and Effinger voted in the affirmative. Ching also voted in the affirmative. Supervisor Cunha did not vote when his name was called and by order of the mayor his vote was recorded in the affirmative. Kumalae was excused from voting. The motion was declared carried and Ku-

malae was again declared to be a duly appointed super-
visor. Was his nomination legally confirmed? In answer-
ing this question we will first consider the qualifications
of Kim Ak Ching to vote on the motion to reconfirm
Kumalae's nomination. If he had no legal right to vote
on this motion, then his vote must be deducted from those
cast in the affirmative. It would then remain to be seen
whether there was left a sufficient number of votes in
the affirmative to confirm Kumalae. Ching was not a
*de jure* officer for the same reason that Kumalae was not
a *de jure* officer. The attempt to confirm Ching on Feb-
ruary 16 was just as futile as it was to confirm Kumalae.
What sort of official standing then did Ching have at the
meeting of March 2? If he had any at all it was as a
*de facto* officer. Assuming but not deciding that so far
as the public and individuals unacquainted with his lack
of legal authority are concerned he was a *de facto* officer,
it by no means follows that he could lawfully vote for
the confirmation of Kumalae. The theory upon which the
acts of *de facto* officers are binding is that it would not
be fair to the public generally and to third parties, deal-
ing with governmental departments, to require them to
ascertain the legal status of everyone who, apparently
clothed with official authority, is in the open and actual
exercise of official functions. The beneficent purpose of
the law in this respect is to protect innocent persons who
do not know and cannot easily ascertain whether one who,
under color of right, holds himself out as a public official
is a mere interloper or a *de jure* officer. The record shows
that Kumalae does not come within the class of persons
which the law protects against the illegal acts of a *de
facto* officer. Only those who are in ignorance of his
lack of legal authority are entitled to claim the benefits
conferred by such an officer. The evidence shows that
prior to the meeting of March 2 Kumalae was informed

that Ching had not been confirmed as a supervisor and therefore had no legal right to act in that capacity. He received such notice through the public press on February 17, the day following the attempted confirmation of himself and Ching. On that date both the Honolulu Advertiser, the leading morning paper, and the Star-Bulletin, the leading afternoon paper, published front-page news articles in bold type reciting the circumstances under which the attempt at confirmation had been made on the day previous. He also received notice through the refusal of the city and county auditor to issue warrants for the salaries of himself and Ching. He also received notice through letters, written to him and Ching on February 25 by the attorney general, notifying them that, after a careful investigation of the law and facts surrounding their alleged appointment as supervisors and their purported confirmation on February 16, he, the attorney general, had reached the conclusion that their appointment to such office was invalid and that under the law they were wrongfully usurping its functions. Finally, he received notice on March 1 by the service on him of process in the present suit. These facts disclose fully that on March 2, when Ching attempted to bestow on the respondent the legal title to the office of supervisor, he knew Ching was utterly without authority to do so. We do not mean to decide that under no circumstances can a *de jure* officer be created by the act of a *de facto* officer. It is not necessary to go so far in this opinion, but we do decide that when one claims a *de jure* title to a public office and the evidence shows, as in this case, that the source of his title is the act of another who is without legal authority to act, and this fact is known to the claimant, his claim to the office cannot be sustained.

Speaking on the subject of *de facto* officers and the principle upon which their acts are held to be valid, the

supreme court of Connecticut in *State* v. *Carroll,* 38 Conn.
449, said on pages 471, 472: "A definition sufficiently ac-
curate and comprehensive to cover the whole ground must,
I think, be substantially as follows: An officer *de facto*
is one whose acts, though not those of a lawful officer,
the law, upon principles of policy and justice, will hold
valid so far as they involve the interests of the public
and third persons, where the duties of the office were
exercised. First, without a known appointment or elec-
tion, but under such circumstances of reputation or
acquiescence as were calculated to induce people, without
inquiry, to submit to or invoke his action, supposing him
to be the officer he assumed to be. Second, under color of
a known and valid appointment or election, but where the
officer had failed to conform to some precedent require-
ment or condition, as to take an oath, give a bond, or the
like. Third, under color of a known election or appoint-
ment, void because the officer was not eligible, or because
there was a want of power in the electing or appointing
body, or by reason of some defect or irregularity in its
exercise, such ineligibility, want of power, or defect being
unknown to the public. Fourth, under color of an elec-
tion or appointment by or pursuant to a public unconsti-
tutional law, before the same is adjudged to be such."

This same court also said on page 467: "The *de facto*
doctrine was introduced into the law as a matter of policy
and necessity, to protect the interests of the public and
individuals, where those interests were involved in the
official acts of persons exercising the duties of an office,
without being lawful officers. It was seen, as was said
in *Knowles* v. *Luce,* that the public could not reasonably
be compelled to inquire into the title of an officer, nor
he compelled to show a title, and these became settled
principles in the law. But to protect those who dealt
with such officers when apparent incumbents of offices

under such apparent circumstances of reputation or color as would lead men to suppose they were legal officers, the law validated their acts as to the public and third persons, on the ground that, as to them, although not officers *de jure,* they were officers in fact, whose acts public policy required should be considered valid. It was not because of any quality or character *conferred upon the officer,* or attached to him by reason of any defective election or appointment, but a name or character given to his acts by the law, for the purpose of validating them. When therefore, in civil cases, the public or third persons had knowledge that the officer was not an officer *de jure,* the reason for validating the acts to which they submitted, or which they invoked, failed, and the law no longer protected them."

Speaking on the same subject the Supreme Court of the United States, in *Waite* v. *Santa Cruz,* 184 U. S. 302, at page 323, said: "A *de facto* officer may be defined as one whose title is not good in law, but who is in fact in the unobstructed possession of an office and discharging its duties in full view of the public, in such manner and under such circumstances as not to present the appearance of being an intruder or usurper. When a person is found thus openly in the occupation of a public office, and discharging its duties, third persons having occasion to deal with him in his capacity as such officer are not required to investigate his title, but may safely act upon the assumption that he is a rightful officer. Thus it is said in *Petersilea* v. *Stone,* 119 Mass. 468: 'Third persons, from the nature of the case, cannot always investigate the right of one assuming to hold an important office, even so far as to see that he has color of title to it by virtue of some appointment or election. If they see him publicly exercising its authority, if they ascertain that this is generally acquiesced in, they are entitled to treat him as

such officer, and, if they employ him as such, should not be subjected to the danger of having his acts collaterally called in question.'"

In *Williams* v. *Boynton,* 147 N. Y. 426, at page 432, the court of appeals of New York said: "The appellant insists that while Sullivan was not supervisor *de jure* he was such *de facto,* and so his vote is to be sanctioned and the resolution upheld. I do not think that the doctrine invoked has any just application to a case like the present. It applies for the protection of third persons or the public, who have acquired rights upon the faith of an appearance of authority and who will be harmed by the actual truth. It does not apply where the official action is challenged at the outset and before any person has been or can be misled by it, and where no rights have, as yet, accrued upon its faith, either of a public or private character. * * * An existing appearance of right which may mislead, is the essential ground of the doctrine, for otherwise there is no excuse for the party deceived and no basis for a demand of protection."

In *Lower Terrebonne Co.* v. *Police Jury,* 40 So. 443, at page 445, the supreme court of Louisiana said: "In the second place, for the purpose of Mr. Barrow's voting, the three gentlemen in question were not officers *de facto* for the further reason that Mr. Barrow knew, or must be held to have known, that they were not the commissioners. * * * Now, this reason is obviously inapplicable to a case where the person 'induced to act without inquiry' happens to be the very person charged by law with the appointment of the officer. Plainly, to apply the principle to such a case would be stretching it beyond the cracking point. Not only this, but it is very far from being made out that Mr. Barrow 'supposed' the three gentlemen in question to be the commissioners."

See also *State* v. *Perkins,* 139 Mo. 106, 117; *Norton* v.

*Shelby Co.,* 118 U. S. 425, 441, 442; and 8 A. & E. Ency.
L., 781, 782.

Having concluded that Ching's vote for the confirma-
tion of Kumalae was unauthorized by law and therefore
cannot be counted, we will next consider whether Ku-
malae was otherwise confirmed at the meeting of March
2. The question that lies at the very threshold of this
inquiry is, was there a quorum of the board present when
the motion to confirm Kumalae was submitted,—not
whether there was a quorum present for any purpose but
whether there was a quorum present competent to act on
the confirmation of Kumalae. If there was not, there was
no meeting of the board for that purpose and any action
taken was void. In deciding whether there was a quorum
present Ching must of course be eliminated. For the rea-
sons already given, so far as the confirmation of Kuma-
lae is concerned Ching was a mere outsider without any
right, legal or otherwise, to vote on that subject. If he
had no right to vote the conclusion is inescapable that he
cannot be counted among those necessary to constitute a
quorum. It is elementary that a quorum must consist of
a sufficient number of the members of the board com-
petent to act on the matters presented. Ching was not
competent to act on the confirmation of Kumalae and was
therefore not a member of the board for that purpose and.
consequently cannot be counted in determining whether
there was a quorum. There is another reason why, per-
haps, Ching cannot be considered in determining whether
there was a quorum. It is evident from the record that
he and Kumalae were looking to each other for assistance
in their confirmation. In fact, each of them voted for
the confirmation of the other. This mutuality of interest
in a common purpose should disqualify both of them from
participating in any way in the proceedings of the board
involving their induction into office. There being between

them this interdependence for confirmation, Ching can no more be counted in making a quorum when the confirmation of Kumalae was voted on than he could be counted when his own confirmation was voted on. It would not be safe where the public interests may be at stake to lay down a rule that would encourage such an exchange of patronage.

It is contended by the respondent that even without counting Ching there was, nevertheless, a quorum present at the meeting of March 2. Let us examine this contention. Section 1723, R. L. 1925, which is a part of the charter of the City and County of Honolulu, provides as follows: "The board of supervisors shall consist of seven members. Each member must be at the time of his election an elector of said city and county, and must have been such for at least two years next preceding his election." Section 1724 provides as follows: "A majority of all the members of the board shall constitute a quorum, but a less number may adjourn from day to day and compel the attendance of absent members in such manner and under such penalties as the board may prescribe." At the meeting of March 2, the board consisted of only five members—two, McClellan and Petrie, having previously resigned. It appears from the evidence that when the meeting was called to order there were present of these five members Clark, Cunha and Effinger—Ahia and Hollinger being absent. It also appears from the evidence that when the motion to reconfirm Kumalae was made Clark, Cunha and Effinger were still present. When the roll of members was called on the motion it is certain Clark and Effinger were present. The evidence is conflicting whether Cunha was present when his name was called. There is some evidence that he absented himself before his name was reached. Assuming that he was present there were then assembled three members, Clark,

Cunha and Effinger. The respondent claims that under the statutes above quoted this is sufficient to constitute a quorum. We cannot sustain this view of the law. The statute provides that "the board of supervisors shall consist of seven members." It also provides that "a majority of all the members of the board shall constitute a quorum." It does not provide that a majority of the members in existence shall constitute a quorum but requires for that purpose a majority of *all* the members of the board. This means, evidently, a majority of all the members of the board as the board is constituted by law. A different construction would be fraught with serious danger. It is conceivable that all the members of, the board except two, or even one, might resign or leave the Territory or die. The respondent's contention would lead to the conclusion that the two, or one, remaining would have the power to administer the affairs of the municipality and bind it in matters of the most serious consequence.

The English courts have taken a similar view of this question as shown by the following quotations:

"Now it has been decided, in the case of *The King* v. *Bellringer,* and others quoted at the bar, that where, by the provisions of any charter, an election is to be made by a body consisting of a definite number (as distinguished from a body consisting of an indefinite number) for the time being or the major part of them  *  *  * a good elective assembly cannot be had without the presence of such a number of persons as will constitute a majority of the entire definite number, although the number present may constitute a majority of so many of the entire number as may happen at the time to be surviving and existing. From the time of the decision of the case of *Rex* v. *Bellringer,* this has been taken as a general and established rule of corporation law.  *  *  * The

reason of the rule I take to be this; where the crown has by its charter constituted a corporate body   *   *   * composed of a certain defined and specified number of individuals, and has by the same charter given certain powers and authorities to a body so constituted, and has ordained a method of supplying vacancies from time to time, so as to give perpetual existence to the body, notwithstanding the necessary failure of its individual members: it cannot be supposed that the crown intended that the powers and authorities so given to a body consisting of such a defined number of persons, should be exercised by a much smaller number, as by only two or three, or that the individuals composing the body should at their pleasure increase their personal influence and authority, by suffering a gradual diminution of their number, and forbearing to exercise the power of renovation and supply, for which a method has been ordained." *The King* v. *Devonshire,* 1 B. & C. 609, 614, 615 (1823).

"The Queen, when she thought fit to grant this charter, granted it to a body, consisting in the whole of thirty-seven   *   *   *   for the government of the borough. The defendant's argument supposes that any number of the corporators (however reduced that number may be) are competent to do the several acts for which the corporation was created; and that all acts done by a majority of the corporators, though reduced, are valid. Without viewing this charter with the eye of a lawyer, it cannot be supposed that the Queen ever intended that any small number of the corporation, however minute, would be sufficient for the purposes for which the charter was granted; and that the survivors, by refusing to fill up the vacancies as they happened, might monopolize the whole government of the borough to themselves." *King* v. *Bellringer,* 4 D. & E. 810, 822 (1792).

In this country there is a conflict of judicial opinion.

We have carefully examined the cases cited by counsel as well as other cases discovered by our own research. The conclusion reached by those courts which hold that a majority of all of the members of the board means a majority of all the members provided by law and not a majority of the members existing at the time action is taken seems to us more consonant with reason than the opposite conclusion reached by other courts.

In *Schermerhorn* v. *Jersey City,* 53 N. J. L. 112, construing a statute similar to ours, the supreme court of New Jersey said at page 116: " 'Three-fourths of all the members of said legislative body' mean the complete board, the full membership, not a reduced number of members as they are at the time of voting."

The most exhaustive and logical discussion of the subject we know of is found in *"In the Matter of the Executive Communication of the 9th of November, A. D. 1868,"* 12 Fla. 653. The governor of Florida in pursuance of a constitutional provision propounded to the justices of the supreme court certain questions of law upon which he desired their opinions in writing. Among these questions was one arising out of the following facts: Under the constitution of the state the senate was required to consist of twenty-four members and a further provision required that a majority of the senate shall constitute a quorum to do business. Several of the senators abandoned their seats by accepting other offices, which left remaining less than the number required by the constitution. A majority of those remaining assembled and took official action. The question therefore was, whether a quorum existed. The chief justice and each of the associate justices replied in writing to the governor's inquiry. The chief justice in his opinion said, at page 682: "It cannot be seriously contended that a *resignation of Senators,* or their expulsion, can have the effect of creating a quorum

to be composed of a less number than a majority of those *elected*. Adopting such a rule, the resignation of all the Senators but three, or even one, would give to that insignificant number the power of a 'majority of the whole number;' the twenty-four districts would all be represented in a single person who would control all the legislation of the State; raise or refuse to raise taxes; overrule the wishes of the people represented in the Assembly; override the veto of the Governor; try impeachment; convict the Governor and Lieutenant-Governor; pronounce them forever disqualified to hold offices, and vote himself governor as the successor of the Lieutenant-Governor; prorogue the Legislature on refusing to agree to an adjournment; refuse to order elections to fill vacancies; and whatever crimes and misdemeanors in office he might commit, could neither be expelled from his seat as Senator or impeached as Governor. This case is extreme, it is true, but nevertheless, legally possible upon the hypothesis suggested. The people of Florida have not adopted a Constitution which, by any plausible construction, may place the government thus at the mercy of a minority of the whole number of members of which either House is to be composed. Chief-Justice Marshal, in the case of Cohen vs. The State of Virginia, 6 Wheaton, 390, says that a majority of the States may refuse to send Senators to Congress, and that the effect of this would be to *suspend* legislation; that a *minority* of the States cannot effect such an obstruction of the Government, but that a majority may, and rightfully, under the Constitution, because a *majority* of States or people may always, of right, change the form of the government. The whole theory and the strength of our form of government rests in the right of the majority, instead of the minority, to make and unmake laws." Mr. Justice Westcott in his opinion, at pages 670-674, said:

"Leaving this precedent, applicable to a particular state of facts not now existing in the State of Florida, we come to a precedent somewhat more in point, although not entirely on account of difference in the constitutional provisions.

"Congressional Globe, volume 18, page 821:

" 'Mr. Jones, of Tennessee, raised a question of order. He contended that one hundred and fourteen members did not constitute a quorum of the House. Two members had been elected to represent the State of Wisconsin, one of whom had appeared and been this morning sworn, and the other was on his way. Counting these two members, the House would consist of two hundred and thirty members, and it would of course take one hundred and sixteen to make a quorum.

" 'The Chair stated that he had been informed by the clerk that one hundred and fourteen were a quorum. The clerk being permitted to explain, said that including the two members from Wisconsin there would be two hundred and thirty members, but there *were three vacancies to be deducted.* This being done, one hundred and fourteen would constitute a quorum.

" 'Mr. Jones denied that the vacant districts were to be deducted.

" 'Mr. Duer contended that the vacant districts ought not to be included in determining the number of which the House consisted, and that none ought to be taken into account but those actually elected and returned.'

"The chair ruled that the vacant districts *were to be included* in the account.

"It will thus be seen that upon that day, including the two members from Wisconsin, the House would have been composed of two hundred and thirty members, including three vacancies; and excluding the three vacancies, that is, seats for which members *were not chosen,* the House

would have been composed of two hundred and twenty-seven members, and one hundred and fourteen would have, with this construction, been a quorum.

"The point was here raised expressly that the vacancies should not be counted in estimating a quorum, and it was decided that they should be.

"Cushing's Law and Practice of Legislative Assemblies, 100:

" 'When the number of which an Assembly may consist at any given time is fixed by the Constitution, and an aliquot proportion of such an Assembly is required in order to constitute a quorum, the number of which such Assembly *may consist,* and not the number of which it does in fact consist at the time in question, is the number of the Assembly, and the number necessary to constitute a quorum is to be reckoned accordingly.' J. of H., VI., 274-395; J. of H., VII., 214.

" 'Thus, in the Senate of the United States to which, by the Constitution, each State in the Union may elect two members, and which may consequently consist of two members from each State, the quorum is a majority of that number, whether the States have all exercised their constitutional right or not.' J. of S., 32d Congressional Globe; Congressional Globe, X., 1.

" 'So in the second branch of Congress, in which, by the Constitution, the whole number of Representatives of which the House may consist, is fixed by the last appointment, increased by the number of members to which newly-admitted States may be entitled, the quorum is a majority of the whole number, including the number to which such new States may be entitled, whether they have elected members or not, making no deduction on account of vacant districts.' J. of H., 30th Congress, 1st Session, 877; Congressional Globe, 18-821.

"In examining this question I have given citations

showing legislative practice. This is a question of constitutional law. The action of Legislative Assemblies, and especially the popular branch, is not authority in the legal sense of that word, that is, the authority which attends a judicial decision. It is seldom a safe criterion, and I should not hesitate to depart from it if I thought it wrong. The question here is an original one.

"The judicial decisions in all the States whose courts have passed upon the subject, so far as I have been able to obtain them, define a quorum to be a majority of all the members that *may* be elected, including casual vacancies.

"Section 12, Article III., of the Constitution of Illinois, requires that 'two-thirds of each House shall constitute a quorum,' and 'the Senate shall consist of twenty-five members.'

"In examining the Constitution as to what constituted a quorum of the Senate under these constitutional provisions, the Supreme Court of Illinois, in the case of People vs. Hatch, 33d Ill., 130-159, held it to be 17.

"Constitution of Maine.—'The Senate shall consist of not less than twenty nor more than thirty-one members elected at the same time as the Representatives.'

" 'A majority of each House shall constitute a quorum to do business.'

"In 6th Greenleaf, 515, the court held a 'Senate cannot exist for the purpose of doing business, unless composed of eleven Senators at least, and such Senate can act only by vote, and decide only by the power of a major of the constitutional quorum.'

"If such a construction was given to this clause in our Constitution as would permit the word House to be modified in its meaning by casual circumstances resulting in vacancies, such a result is possible as would vest the entire powers of the Legislative Department of the gov-

ernment in less than one-third of the members for which the Constitution provides.

"There is as much reason under our Constitution for ruling that the term House means that members present, whether they be three or six, as there is for deciding that vacancies should be deducted where there are vacancies from death, resignation, or a failure to elect, when there has been no opportunity afforded to elect.

"The meaning of the word 'House,' as used in the clause of the Constitution under consideration, does not depend on such contingencies. It has a fixed meaning under all circumstances, which is, the entire number of which it *may be composed,* and a constitutional quorum must be a majority of that number.

"It is, therefore, my opinion, upon the facts submitted in your communication and upon the authorities and precedents cited, that twelve Senators did not constitute a quorum to do business; and hence, that there was no Senate within the meaning of this clause of the Constitution, and that 'a Legislature of the State of Florida, consisting of a Senate and Assembly, vested with the legislative authority of the State,' did not convene in extraordinary session under your proclamation of November 3, 1868."

See also *Doughty* v. *Scull,* 96 Atl. (N. J.) 564; and *King* v. *Miller,* 6 D. & E. 268, 278, 279.

We are not unmindful that the view we take of the statute may also lead to serious results. If a majority of all the members of the board should for any reason cease to be members, thus making a quorum impossible and therefore making it impossible to fill the vacancies, we know of no statutory provision by which the legislative branch of the municipal government could continue to function. This, however, is a matter for legislative concern and cannot influence us in placing the construc-

tion on the statute which we think it reasonably bears.

The judgment of the lower court is affirmed.

*W. B. Lymer,* Attorney General (also on the brief), for petitioner.

*J. A. Matthewman* and *I. M. Stainback* (also on the briefs) for respondent.