**PEOPLE OF the STATE OF CALIFORNIA ex rel. Evelle J. YOUNGER, Attorney General, Plaintiff-Appellant,**

v.

**TAHOE REGIONAL PLANNING AGENCY et al.,**
**Defendants-Appellees.**

No. 74–2546.

United States Court of Appeals, Ninth Circuit.

April 30, 1975.

As Amended June 11, 1975.

Certiorari Denied Oct. 6, 1975.

See 96 S.Ct. 131.

Alexander T. Henson, Deputy Atty. Gen. (argued), San Francisco, Cal., for plaintiff-appellant.

John Frankovich (argued), and F. R. Breen (argued), Reno, Nev., for defend-ants-appellees.

OPINION

Before KOELSCH and CHOY, Circuit Judges, and KELLEHER,* District Judge.

CHOY, Circuit Judge:

The State of California appeals from the district court's refusal to grant a preliminary injunction to halt construction of two hotel-casinos in the Lake Tahoe Basin (the Basin). We affirm.

In order to protect the natural resources and ecological balance of the

---

* Honorable Robert J. Kelleher, United States District Judge, Central District of California, sitting by designation.

Lake Tahoe Basin [1] the states of California and Nevada in 1968 entered into a compact to create a regional agency with extensive powers to regulate and control development within the Basin. Cal.Govt. Code § 66801 (West Supp.1975); Nev. Rev.Stat. § 277.190 et seq. (1973). The compact, known as The Tahoe Regional Planning Compact (the Compact), received the consent of Congress in December 1969. Public Law 91–148, 83 Stat. 360.

The Compact created the Tahoe Regional Planning Agency (TRPA), which was composed of five delegates from each state and one non-voting delegate representing the federal government. The TRPA was charged with responsibility for developing within ninety days a regional interim plan and, within eighteen months a regional plan which would reflect a wide variety of economic, environmental and social considerations. The Compact also directed the TRPA to adopt all ordinances, rules, regulations and policies necessary to effectuate the regional interim plan and the regional plan. See League to Save Lake Tahoe v. Tahoe Regional Planning Agency, 507 F.2d 517, 518 (9th Cir. 1974).

Pursuant to its mandate, the TRPA adopted various procedural regulations and imposed certain land use, height and density restrictions applicable to developments in the Basin. If a builder wanted to develop more than 200 square feet of land or to erect certain types of structures, he was required first to seek a permit from the local permit-issuing authority (generally, the zoning authority of the county in which the construction was to take place). The permit-issuing authority, according to TRPA regulations, was required to adhere to the policies and land restrictions adopted by the TRPA but was granted the power to issue variance permits under certain circumstances.

Appellees Jennings and Kahle each applied for and was granted an administrative (special use) permit from the governing body of Douglas County, Nevada, for the construction of a hotel-casino. The Douglas County commissioners also granted a height variance whereby each appellee was permitted to construct his hotel-casino to a height greater than the forty foot limit allowed by TRPA's Land Use Ordinance. In granting the variances the commissioners, as required by Section 8.33 of the Land Use Ordinance, made a specific finding that the height variance for each hotel would be a benefit to the general welfare of the region. The projects were then submitted for approval to the Nevada Tahoe Regional Planning Agency, a state agency empowered to exercise environmental control over gaming establishments in the Nevada side of the Basin. The Nevada agency approved both projects.

Jennings and Kahle then submitted the special use and height variance permits to the TRPA for review, as required by Section 4.32 of the Land Use Ordinance. On July 25, 1974, following a hearing before the TRPA, a motion to approve both projects was made as well

---

1. Article I of the Compact states:

"(a) It is found and declared that the waters of Lake Tahoe and other resources of the Lake Tahoe region are threatened with deterioration or degeneration, which may endanger the natural beauty and economic productivity of the region.

"(b) It is further declared that by virtue of the special conditions and circumstances of the natural ecology, developmental pattern, population distribution, and human needs in the Lake Tahoe region, the region is experiencing problems of resource use and deficiencies of environmental control.

"(c) It is further found and declared that there is a need to maintain an equilibrium between the region's natural endowment and its manmade environment, to preserve the scenic beauty and recreational opportunities of the region, and it is recognized that for the purpose of enhancing the efficiency and governmental effectiveness of the region, it is imperative that there be established an areawide planning agency with power to adopt and enforce a regional plan of resource conservation and orderly development, to exercise effective environmental controls and to perform other essential functions, as enumerated in this title."

as a motion to deny both projects. The vote was as follows:

*Motion to Approve Projects*

|  | For | Against |
|---|---|---|
| California Delegates | 0 | 5 |
| Nevada Delegates | 3 | 2 |

*Motion to Deny Projects*

|  | For | Against |
|---|---|---|
| California Delegates | 5 | 0 |
| Nevada Delegates | 2 | 3 |

Soon after the vote, Jennings and Kahle made plans to commence construction on their respective projects, California brought this action to enjoin construction, and the district court issued a temporary restraining order. After a hearing, however, it dissolved the order and denied California's motion for a preliminary injunction. The court's decision was based on its conclusion that the TRPA votes did not constitute "action" within the meaning of the Compact and that the TRPA's failure to take action resulted in the project's being deemed approved under Article VI(k) of the Compact.

### Scope of Review

By arguing that the district court's decision may not be reversed unless it amounted to an abuse of discretion, the builders raised a threshold question relating to the scope of appellate review. Although it is a well-settled general rule that the grant or denial of an interlocutory injunction is a matter committed to the discretion of the district court, that rule does not apply to cases where the court's action is erroneous as a matter of law. *See* K–2 Ski Co. v. Head Ski Co., Inc., 467 F.2d 1087, 1088 (9th Cir. 1972). Since the district court's denial of the preliminary injunction was based solely upon its *legal* conclusions on the meaning of the TRPA Compact, its action is freely reviewable. *See* Societe Comptoir De L'Industrie Cotonniere Etablissements Boussac v. Alexander's Department Stores, Inc., 299 F.2d 33, 35–36 (2d Cir. 1962).

### "Final Action"

The unique issue raised by this appeal is whether, within the meaning of the Compact, no "final action" is taken by the TRPA on a proposal unless there is a majority vote by *each* state's delegation that the proposal presented is either approved, rejected, or modified. At the center of this controversy finding California and Nevada on opposite sides are two Compact provisions. Article III(g) provides:

> A majority of the members of the governing body from each state shall constitute a quorum for the transaction of the business of the agency. A majority vote of the members present representing each state shall be required to take action with respect to any matter. . . .

And Article VI(k) provides:

> Whenever under the provisions of this article or any ordinance, rule, regulation or policy adopted pursuant thereto, the agency is required to review or approve any proposal, public or private, the agency shall take final action, whether to approve, to require modification or to reject such proposal, within 60 days after such proposal is delivered to the agency. If the agency does not take final action within 60 days, the proposal shall be deemed approved.

According to California, Article III(g) is ambiguous and should be interpreted as follows:

> When a quorum is present and votes on a proposal, if that proposal does not receive a positive vote from the majority of both states then the proposal fails. That vote is final action and if that vote comes within 60 days after the proposal is submitted to the TRPA, Article VI(k) of the Compact with its 60 day provision is irrelevant.

Brief for Appellant at 12–13.

Appellees, on the other hand, emphasize the Article III language that a majority vote of the members representing each state shall be required to "*take ac-*

*tion"* with respect to any matter. According to the builders, unless there is a dual majority vote either to approve, reject or modify a proposal, Agency "action" has not taken place and Article VI(k) comes into play even though a vote has been recorded. Appellees' interpretation would dictate that their projects be "deemed approved" under Article VI(k). This is so because the majority of each state's delegation on the TRPA failed either to approve or reject the projects. In other words, appellees suggest that under the statutory and regulatory scheme a "split vote" (i. e., a majority of one state's representatives voting one way and a majority of the other state's representatives voting another) should be considered a nullity, or at least not an "action" or "final action." The district court, finding the language of the two Articles unambiguous, adopted the appellees' view of the voting and approval procedure.

The entire dispute turns on the meaning of the words "action" in Article III(g) and "final action" in Article VI(k). The reason these simple terms have caused so much difficulty is that appellees' interpretation is inconsistent with common parliamentary procedure. Generally, once a quorum is present, any vote by an organization on any proposal is considered "action." Thus, if there is a proposal on the floor for approval of a new meeting time, and it fails to gain a majority vote (e. g., the vote ends in a tie), "action" has been taken and the proposal is considered *rejected. See* Robert's Rules of Order Newly Revised § 43 (1970). Consistent with this parliamentary rule are numerous decisions by courts holding that tie votes by zoning boards or other governmental bodies have the effect of *denying* the proposals before them. *See, e. g.,* Sokolis v. Zoning Board of Appeals of Springfield, 21

Ill.App.2d 178, 157 N.E.2d 427 (1959); Montgomery County Board of Appeals v. Walker, 288 Md. 574, 180 A.2d 865 (Ct. App.1962). According to California, these cases indicate that it is absurd to argue that a split vote by the TRPA does not amount to a "denial" or at least "action". California, understandably, wants to avoid the situation where a significant construction project is "deemed approved" even though its proponents can muster no more than a bare majority of one state's delegation or quorum.

Although we find California's argument extremely appealing on an emotional level, it simply does not take into account the plain meaning of the Compact and the intent of its architects. California makes a critical error in likening the Compact to ordinary zoning legislation and the TRPA to a typical zoning board. In interpreting the provisions of the unique statutory scheme involved here we must look not to Robert's Rules of Order or decisions dealing with tie votes by zoning boards, but instead to the actual language used, as viewed against the backdrop of the Compact's legislative history.

What California fails to acknowledge fully is that the Compact and the TRPA are *sui generis* offsprings of a marriage between sovereign partners, each extremely reluctant to relinquish its sovereignty over a portion of its territory. The TRPA is a powerful planning agency with authority to establish minimum land use standards applicable throughout the Basin and to police the region to ensure compliance with the general plan and any ordinances passed. However, its sovereign creators did not envision it as a super bi-state zoning board whose approval would be a prerequisite to all land development,[2] or as an omnipotent board which could enforce its will over the majority vote of one state's delegation.[3]

---

**2.** Under the Compact, no building proposal need be reviewed and approved by the TRPA before construction except public works projects (and only those built by parties other than the State of California or Nevada.) Article VI(c).

**3.** It is clear from the legislative history of the Compact that Nevada, in particular, was extremely reluctant to relinquish much of its sovereignty over land use controls and planning. *See generally* Note, Regional Government for Lake Tahoe, 22 Hastings L.J. 705

The TRPA itself recognizes the limits of its authority, and has even delegated some of the authority it has to local government entities. In promulgating the overall plans, regulations and procedures with respect to land use and development, the TRPA provided that the power to issue building permits (including special use and variance permits) remains in the hands of the local zoning authorities. See TRPA Land Use Ordinance § 4.10. The TRPA reserved for itself, with respect to permits, a limited *review* function. See *id.* at § 4.32. In other words, neither the statutory nor regulatory scheme requires that a proposed project[4] gain the approval of the TRPA before it is built. This is so even if the project has been granted a variance from the general plan by the local permit-issuing authority. TRPA's Land Use Ordinance § 4.32 provides:

> Administrative permits and variance permits required pursuant to Section 4.10(2) and issued by the permit-issuing authority shall be subject to Agency review, and upon review of any such permit the Agency shall take final action, whether to approve, to require modification or to reject such permit within 60 days after such permit is delivered to the Agency. If the agency does not take final action within 60 days, the permit shall be deemed approved.

This important regulation is perfectly consistent with Articles III(g) and VI(k) and indicates, as the builders have argued, that "final action" does not take place unless the TRPA does one of three things: 1) approves the permit 2) requires modification or 3) rejects the permit. This regulation evidences TRPA's

own construction of the disputed statutory provisions, and we should follow the construction by those charged with the statute's execution unless there are compelling indications that it is wrong. New York State Department of Social Services v. Dublino, 413 U.S. 405, 421, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973). We find no such indications.

Under the TRPA statutory and regulatory scheme, variance and use permits must be submitted for review to the TRPA, and the TRPA has broad discretion to reject or approve on the merits each building permit request. However, the TRPA's power of de novo review is fully exercised only when a dual majority for or against a proposal is reached.

When a split vote is registered, the TRPA assumes a different posture, and becomes more like an appellate court than a zoning board. If an appellate court cannot agree on a majority decision, then the lower body's decision stands affirmed—the rationale being that no "decision" has been reached by the higher authority. *Cf.* State Department of Ecology v. City of Kirkland, 84 Wash.2d 25, 523 P.2d 1181, 1184 (1974). Similarly, in this case where no dual majority was mustered for either approval or rejection, we conclude that no "decision" was ever rendered nor "final action" ever taken by the TRPA. By virtue of Article VI(k) which provides in such a case that the project be deemed approved, the decision of the local permit issuing authority in effect stands affirmed.

Such a reading of the Compact notwithstanding California's protestations to the contrary,[5] does not gut its provi-

---

(1971). For example, Nevada insisted that California eliminate from its law the provision that a simple majority vote of the TRPA quorum could take action on proposals. California acquiesced and adopted the "dual majority" provision, Article III(g).

4. The only exception being public works projects other than those built by the State of California or Nevada. *See* Article VI(c); note 2 *supra.*

5. California also argues that such an interpretation would allow construction of projects

that are in blatant violation of the regional plan. Two responses are appropriate: First, the TRPA chose to vest variance-granting power in the local authorities and set up guidelines for them to follow; second and more important, if the local authorities violate the variance guidelines and other ordinances in granting permits, either state as well as the TRPA has the right to bring action in state or federal court seeking compliance with the regional plan and the TRPA's regulations. *See* Article VI(b).

sions nor frustrate its purpose. The district court's interpretation of Articles III(g) and VI(k), which we affirm, gives effect to the statutory scheme carefully devised by two states reluctant to relinquish very much sovereignty. That the Compact may not be a powerful anti-growth measure in that it permits a majority of one state to stop effective action by the TRPA is not the result of a court imposed interpretation, but of deliberate action by the legislatures of Nevada and California and the Congress of the United States. This court is not empowered to rewrite the Compact. California's remedy lies solely with the legislative branches of the parties to the Compact.

Affirmed.