75 P.3d 160

HAWAII ELECTRIC LIGHT COMPANY, INC., a Hawai'i corporation, Appellant–Appellee,

v.

DEPARTMENT OF LAND AND NATURAL RESOURCES, State of Hawai'i; Board of Land and Natural Resources, as the Executive Head of the Department of Land and Natural Resources, State of Hawai'i; Department of Hawaiian Home Lands, State of Hawai'i; Waimana Enterprises, Inc., a Hawai'i corporation; and Mahi Cooper, Appellees–Appellees.

and

Peggy Ratliff and Keahole Defense Coalition, Appellees–Appellants.

and

Department of Hawaiian Home Lands, State of Hawai'i, Appellee–Appellant in No. 21422.

Waimana Enterprises, Inc., a Hawai'i corporation, Cross–Appellant–Appellee,

v.

Department of Land and Natural Resources, State of Hawai'i; Board of Land and Natural Resources, as the Executive Head of the Department of Land and Natural Resources, State of Hawai'i; Department of Hawaiian Home Lands, State of Hawai'i; Hawaii Electric Light Company, Inc., a Hawai'i corporation; and Mahi Cooper, Cross–Appellees–Appellees.

and

Peggy Ratliff and Keahole Defense Coalition, Cross–Appellees–Appellants.

and

Department of Hawaiian Home Lands, State of Hawai'i, Cross–Appellee–Appellant in No. 21422.

Peggy Ratliff, Cross–Appellant–Appellant,

v.

Department of Land and Natural Resources, State of Hawai'i; Board of Land and Natural Resources, as the Executive Head of the Department of Land and Natural Resources, State of Hawai'i; Department of Hawaiian Home Lands, State of Hawai'i; Hawai'i Electric Light Company, Inc., a Hawai'i corporation; Waimana Enterprises, Inc., a Hawai'i corporation; and Mahi Cooper, Cross–Appellees–Appellees (No. 21422).

Mahi Cooper, Cross–Appellant–Appellee,

v.

Department of Land and Natural Resources, State of Hawai'i; Board of Land and Natural Resources, as the Executive Head of the Department of Land and Natural Resources, State of Hawai'i; Department of Hawaiian Home Lands, State of Hawai'i; and Waimana Enterprises, Inc., a Hawai'i corporation, Cross–Appellees–Appellees.

and

Peggy Ratliff and Keahole Defense Coalition, Cross–Appellees–Appellants (No. 21422).

Hawai'i Electric Light Company, Inc., a Hawai'i corporation, Plaintiff–Appellee,

v.

Peter Young,[1] in his capacity as Chairman of the Board of Land and Natural Resources, State of Hawai'i; Department of Land and Natural Resources, State of Hawai'i; Board of Land and Natural Resources, as the Executive Head of the Department of Land and Natural Resources, Defendants–Appellees.

and

John Does 1–10; Jane Does 1–10; Doe Corporations, PArtnerships, Governmental Units or Other Entities 1–20, Defendants.

and

Keahole Defense Coalition and Peggy Ratliff, Intervenors–Appellants (No. 21422).

Waimana Enterprises, Inc., a Hawai'i corporation, Plaintiff–Appellee,

v.

Rodney Maile,[2] Hearing Officer for the Department of Land and Natural Resources; Peter Young,[3] Chairman of the Board of Land and Natural Resources, State of Hawai'i; Board of Land and Natural Resources, State of Hawai'i, Defendants–Appellees.

and

Peggy Ratliff, Defendant–Appellant.

Joy Hanson; Brad Houser; Alice Goo; Dr. Nathalie Tucker; Russell Wertz; Keichi Ikeda; Irma Gilger; Jerry Rothstein; Linday Bradley, Plaintiffs–Appellees,

v.

State of Hawai'i, Department of Land and Natural Resources, and Office of Environmental Quality Control, Defendants–Appellees.

and

John Does 1–10; Jane Does 1–10; Doe Corporations, Partnerships, Governmental Units or Other Entities 1–20, Defendants (No. 21263).

Waimana Enterprises, Inc., a Hawai'i corporation, Appellant–Appellee,

v.

Department of Land and Natural Resources, State of Hawai'i; Board of Land and Natural Resources, as the Executive Head of the Department of Land and Natural Resources, State of Hawai'i; Hawaii Electric Light Company, Inc., a Hawai'i corporation; and Mahi Cooper, Appellees–Appellees.

and

Peggy Ratliff, Appellee–Appellant, (No. 21263).

Waimana Enterprises, Inc., a Hawai'i corporation, Plaintiff–Appellee,

v.

Peter Young,[4] in his capacity as Chairman of the Board of Land and Natural Resources, State of Hawai'i; State of Hawai'i, Department of Land and Natural

---

1. Pursuant to Hawai'i Rules of Appellate Procedure (HRAP) Rule 43(c)(1), Peter Young, the current Chairman of the Board of Land and Natural Resources, has been substituted for Michael D. Wilson, the Chairman at the time this case was decided by the third circuit court.

2. The Department of Land and Natural Resources no longer employs any hearing officers but, rather, hires hearings officers as needed. Thus, no one has been substituted for Rodney Maile, the Department's hearing officer at the relevant times indicated herein.

3. *See supra* note 1. Peter Young has been substituted for Keith Ahue.

4. *See supra* note 1.

Resources; State of Hawai'i, Office of
Environmental Quality Control,
Defendants–Appellees.

and

John Does 1–10; Doe Corporations, Part-
nerships, Governmental Units or Other
Entities 1–10, Defendants (No. 21263).

No. 21369.

Supreme Court of Hawai'i.

July 8, 2003.

As Amended Aug. 25, 2003.

Michael Matsukawa, on the briefs, for Defendant–Appellant/Appellee–Appellant & Appellee/Cross–Appellee/Cross–Appellant/ Intervenor–Appellant Peggy Ratliff; and Intervenor–Appellant Keahole Defense Coalition.

Galen C.K. Leong, Wayne Nasser and Keith Yonamine, Honolulu, on the briefs (Ashford & Wriston), for Appellant/Cross–Appellee–Appellee, Department of Hawaiian Home Lands, State of Hawai'i.

Benjamin A. Kudo, Wesley M. Fujimoto, Lori Ann K. Koseki, Stacy E. Uehara, & Naomi S. Uyeno, Honolulu, on the briefs, (Dwyer Imanaka Schraff Kudo Meyer & Fujimoto) for Appellant–Appellee, Hawaii Electric Light Company.

Mahi Cooper, Appellee/Cross–Appellee/Cross–Appellant–Appellee, pro se.

Sandra–Ann Y.H. Wong, on the briefs, for Plaintiff–Appellee/Appellant Waimana Enterprises, Inc.

Randall Y.K. Young, Deputy Attorney General, State of Hawai'i, on the briefs, for Defendants–Appellees, Department of Land and Natural Resources, Board of Land and Natural Resources, Chair of the Board of Land and Natural Resources and Hearing Officer for the Department of Land and Natural Resources.

On the briefs: Stephen D. Whittaker and David W. Lacy (Whittaker & Lacy) for Amicus Curiae Na Leo Pohai.

Paul H, Achitoff, Honolulu, David L. Henkin, D. Kapua'ala Sproat, on the briefs, (Earthjustice Legal Defense Fund) for Amicus Curiae Sierra Club.

MOON, C.J., LEVINSON, and ACOBA, JJ., Circuit Judge BLONDIN, Assigned in place of NAKAYAMA, J., Recused, and Circuit Judge POLLACK, Assigned by reason of vacancy.

Opinion of the Court by ACOBA, J.

We hold that under Hawai'i Revised Statutes (HRS) § 171–5 (1993) any action by the Board of Land and Natural Resources (the Board or the BLNR) requires a majority vote of all the members to which the Board is statutorily entitled. Thus, four votes are necessary for the Board to take any action. *See* HRS § 171–4 (1993) (the Board "shall be composed of six members"). Consequently, we also hold that because the Board failed to render four votes either approving or rejecting a Conservation District Use Application (application) in this case, the HRS § 183–41 (1993) [5] 180–day default provision allowed the applicant to subject its land to the use applied for.

---

**5.** HRS § 183–41 was repealed in 1994, and replaced generally by HRS § 183C–6(b) (Supp. 2002). *See infra* notes 20 & 22. In pertinent part, HRS § 183–41 states:

> **Conservation districts.** (a) There are established conservation districts which shall consist of lands which were in the forest and water reserve zones on January 21, 1957, and those lands added to the conservation district by the land use commission pursuant to chapter 205 or by law. Zoning of lands in the conservation district shall be under the jurisdiction of the department and the provisions of this section unless the land is reclassified out of the conservation district by the land use commission or by law. No use, except a nonconforming use as defined in subsection (b), shall be made of these areas unless the use is in accord with a zoning rule adopted pursuant to subsection (c)(2), or unless the use is allowed under a temporary variance granted by the department; provided that any owner of land within the conservation district who shall desire to establish a use or uses for the owner's land, or a greater or different use or uses, if the owner's land is classed as nonconforming shall make application in accordance with subsection (d), and if *within one hundred eighty days after receipt of the application the depart-*

> *ment shall fail to give notice, hold a hearing, and render a decision consistent with the standards set forth in subsection (c)(1), the owner may automatically put the owner's land to the use or uses requested in the owner's application.* When an environmental impact statement is required pursuant to chapter 343, or when a contested case hearing is requested pursuant to chapter 91, the one hundred eighty days may be extended to an additional ninety days at the request of the applicant. Any additional extensions shall be subject to the approval of the board.
>
> . . . .
>
> (c) To effectuate this section, the department shall have the following powers and duties, in addition to all other powers and duties:
>
> . . . .
>
> (2) The department, after notice and hearing as provided in this section, shall adopt rules governing the use of land within the boundaries of the conservation district as will not be detrimental to the conservation of necessary forest growth, the conservation and development of water resources adequate for present and future needs, and the conservation and preservation of open space areas for public use and enjoyment.
>
> (Emphases added.)

## I.

On August 26, 1992, Appellant–Appellee Hawaiian Electric Light Company (HELCO) submitted an application, CDUA HA–487A, to modernize and expand an electric generating station located on 14.9 acres of state conservation land at Keahole, North Kona, Hawaii. Land uses within a conservation district are governed by the Board pursuant to HRS § 183–41. In order to propose a change in land use, land owners must submit an application to the Board, which then, after "notice and hearing[,]" may adopt "rules governing the use of the land within the boundaries of the conservation district." HRS § 183–41(c)(2). HRS § 183–41(a) further directs, however, that "if within one hundred eighty days after receipt of the application the department shall fail to give notice, hold a hearing, and render a decision" the "owner may automatically put the owner's land to the use or uses requested in the owner's application."

Following a hearing on HELCO's application, two tenants of neighboring Keahole Agricultural Park, Mahi Cooper (Cooper) and Peggy Ratliff (Ratliff); a business competitor, Waimana Enterprises Inc. (Waimana);[6] and the State of Hawai'i Department of Land and Natural Resources (Department or DLNR) asked for a contested case hearing.

The Board approved the contested case hearing, but attempts to schedule it were accompanied by requests from HELCO to extend the 180–day period. HELCO apparently had determined that it needed to complete an environmental impact statement (EIS)[7] prior to the Board's review of the application. When HELCO finally completed the EIS and submitted it to the Board, the time allowed for review of the application had nearly expired. Other efforts to meet the statutory deadline were frustrated by incidental problems. For example, the Board's first hearings officer, Rodney Maile, disqualified himself from the hearing. BLNR's second hearings officer, Glenn Nagata, fell seriously ill. Accordingly, the Board proceeded to vote on the application without holding a contested case hearing, operating on the assumption that no further time extensions could be granted.

On May 13, 1994, the Board voted on a DLNR staff member's motion to deny HELCO's application without prejudice. HRS § 171–5 governs actions of the Board and states, in pertinent part, that *"[a]ny action taken by the board shall be by simple majority of the members of the board.* Four members of the board shall constitute a quorum to do business." (Emphasis added.) On the vote to adopt the DLNR's staff's recommendation to deny the application without prejudice, the vote was two in favor, three against, and one recusing. On the vote to grant the application, there was no one in favor, two against, one recusing, and three not voting.

In four separate cases, which were later consolidated, several parties appealed the Board's vote to the third circuit court (the court),[8] pursuant to HRS § 91–14 (1993)[9] (the first agency appeal). On November 9, 1994, the court invalidated the votes of the Board and held that: 1) because the Board failed to garner four votes to either approve or to reject HELCO's application, the Board took no "action" on the application;[10] and 2)

---

6. Waimana is the parent company of Ola La'a, which is a general partner of Kawaihae Cogeneration Partners (KCP). KCP is planning a cogeneration facility located on land leased from the DHHL in Kawaihae, County of Hawaii.

7. An EIS is an "informational document" that discloses the environmental effects of a proposed action, effects of a proposed action on the economic and social welfare of the community and state, effects of the economic activities arising out of the proposed action, measures proposed to minimize adverse effects, and alternatives to the action and their environmental effects.
HRS § 343–2 (1993).

8. The Honorable Ronald Ibarra presided over the case.

9. HRS § 91–14 states that "[a]ny person aggrieved by a final decision and order in a contested case or by a preliminary ruling of the nature that deferral of review pending entry of a subsequent final decision would deprive appellant of adequate relief is entitled to judicial review thereof under this chapter. . . ."

10. After the court's determination that a "majority" consisted of all members of the board and not that of a quorum, the legislature amended HRS § 171–5 to indicate that a majority consisted of the members present and voting with respect to a

it would be a denial of procedural due process to allow HELCO to automatically expand the Keahole generating station while there were requests for contested cases still pending that the Board had not acted upon. The court then remanded the case and ordered the Board to hold a contested case hearing within 49 days, or as extended by the Board. The remand order also specified that Waimana did not have a due process right in the contested case hearing because "its economic interest [did] not constitute 'property[.]'" However, Waimana was made a party to the subsequent contested case by stipulation among all of the parties.

Prior to the contested case hearing, the Department of Hawaiian Home Lands (DHHL) was allowed to intervene, as DHHL had recently obtained from the State of Hawai'i a 153-acre parcel of land adjoining HELCO's Keahole generating station. DHHL had intended to use this land for residential development. In addition, the DLNR withdrew as a party from the contested case hearing, for unexplained reasons.

On November, 29, 1994, Board Chairperson Ahue extended the period to process HELCO's application by one year, pursuant to the court's remand order.[11] It appears this extension was ordered to allow adequate time to retain a hearing officer and to prepare for the contested case hearing. None of the parties objected to this extension.

The contested case was held over a five day period, spanning from November 20, 1995 to November 29, 1995, before hearing officer retired Justice Frank D. Padgett (Padgett). The parties involved were HELCO, Cooper, Ratliff,[12] Waimana, and DHHL. On December 13, 1995, Padgett recommended denying the application and issued proposed findings and conclusions.

On April 22, 1996, after several extensions of time,[13] the Board considered the proposed decision and order. Only five members voted due to the recusal of one board member.[14] The Board voted three to two in favor of adopting Padgett's recommendations and denying the application. The outcome of the converse question, namely whether or not to grant HELCO's application, had a predictable result of two to three against the motion. Accordingly, the Board issued the following minute order No. 11:

  3. [The application] is denied.

  4. The BLNR does not intend to deliberate further, or vote again, on this matter. The BLNR does not intend to extend the present April 26, 1996 deadline to take further action in this matter.

By letter dated April 24, 1996, HELCO objected to the Board's denial of its application on the basis that it was contrary to HRS § 183-41, and the Board's own rules and regulations. In response, on May 10, 1996,

decision implicating the automatic approval provision, now HRS § 183C-6(b), the successor statute to 183-41. *See infra* note 27. *See also* HRS § 171-5 (Supp.2002) ("provided that a simple majority of the members present at a meeting and qualified to vote shall be required to allow any decision pursuant to section 183C-6(b)"). This amendment does not implicate the analysis of this case because the statute does not contain language of a retrospective nature. *See* Sen. Conf. Comm. Rep. No. 40, in 2001 Senate Journal, at 868 ("Nothing in this measure should be construed as a position either for or against any application for a permit pursuant to section 183C-6, HRS, that is pending before the board on the effective date of this Act."); *see also* HRS § 1-3 (1993) ("No law has any retrospective operation, unless otherwise expressed or obviously intended.").

11. We observe that the court determined that the Board had the authority to extend the 180-day deadline pursuant to Hawai'i Administrative Rules (HAR) Rule 13-1-14, which states that

"[w]henever [an] agency ... is required to take action within the period prescribed or allowed by these rules, ... the board or its chairperson may, .. (1)[b]efore the expiration period of the prescribed period, ... extend the period[.]" As it is not an issue on appeal, we make no determination as to whether the court or the BLNR had the authority to extend the date of the contested case hearing beyond the 180-day deadline and the extensions otherwise provided for by statute. *See* HRAP Rule 28(b)(7) ("Points not argued may be deemed waived.").

12. Ratliff and Keahole Defense Fund (KDC) have filed joint briefs.

13. Although it is somewhat uncertain, the court determined that the final extension ended on April 26, 1996.

14. The sixth member of the board recused himself because he owned stock in HELCO's parent company, Hawaiian Electric Company.

the Board issued an amended Minute Order No. 11 that modified section 3 of the order to state that "[t]here were only two votes in favor of granting [the application]. Therefore, the BLNR will not issue a permit with respect to [this application.]"

On May 17, 1996, HELCO filed a notice of appeal in the circuit court. On May 22, 1996, Cooper, Ratliff, and Waimana filed separate notices of appeal. On May 29, 1996, HELCO filed a complaint for declaratory judgment seeking an order that the Board approve HELCO's construction plans. The four appeals and the declaratory judgment action were consolidated for disposition (the second agency appeal). On January 2, 1997, the court ruled that the failure to deny the application by four votes constituted non-action on the part of the Board and, by operation of HRS § 183-41, HELCO could put the Keahole conservation land to use as requested in the application:

> The BLNR's failure to take any valid action or render a proper decision on HELCO's [application] after the expiration of the application deadline of April 26, 1996, results in HELCO being able to automatically put its land to the uses requested in the application. Section 183-41, HRS, *Town v. Land Use Commission*, [55 Haw. 538, [524 P.2d 84] (1974)].

Several months later, on August 18, 1997, and again on February 10, 1998, the court amended this decision, stating that HELCO's application was subject to conditions as determined by the Board and HELCO's application. On August 29, 1997, Appellants Ratliff and KDC requested the court to remand the matter back to the Board in light of the amendments, but on February 11, 1998, the court entered its final judgement without a remand order.

## II.

On appeal, the parties [15] to this case present the following dispositive questions: 1) did the court have jurisdiction to review the agency vote if there was no final order, conclusions, and findings from the Board; 2) did the court erroneously deprive the intervenors of their due process rights by ruling on this case without such findings and conclusions; 3) does the phrase "simple majority of the board" in HRS § 171-5 refer to all the members of the Board, or to those members present and voting at a hearing; and 4) did the Board "render a decision" pursuant to HRS § 183-41(a) when it voted 3-2, short of a majority of all the members of the Board, to deny HELCO's application?

■ In addition, the intervenors raise other issues which we do not consider controlling. We address these matters at relevant points in the text and in footnotes. Some or all of the intervenors, as the case may be, contend that the court erred in: 1) allowing the attorney general to abandon the Board's original position; [16] 2) failing to compel a recusing Board member to vote on HELCO's application; [17] 3) omitting the requirement that HELCO obtain the signa-

15. Some of the parties are technically appellees, even though they argue the same position as the appellants. *See* HRAP Rule 3(d) ("The party appealing shall be denominated the appellant.... All other parties shall be denominated appellees[.]"). To avoid confusion, Cooper, Ratliff and KDC, Waimana, and DHHL are generally referred to as the intervenors.

16. Cooper and Ratliff and KDC contend that the attorney general made no effort to advocate the position of the majority of the Board members voting and, instead, sided with HELCO's position on appeal. As our decision is dispositive on other grounds, we do not address this argument. We do note, however, that when the attorney general's "vision of the 'state's legal interests[ ]' is at variance with that of her statutory client[,]" *Chun v. Board of Trustees of the Employees' Retirement Sys.*, 87 Hawai'i 152, 171, 952 P.2d 1215, 1234 (1998), "it is the duty of the Attorney

General to zealously advocate the public policy positions of her client in pleadings, in negotiations, and in the courtroom and to avoid even the appearance of impropriety by appearing to be in conflict with the desires of her client." *Id.* at 174–75, 952 P.2d at 1237–38 (quoting *Manchin v. Browning*, 170 W.Va. 779, 296 S.E.2d 909, 920–21 (1982) (brackets omitted)). In addition, if an attorney general were to be in a conflict of interest with a state official or agency, the attorney may be "ethically obligated to recommend the retention of other counsel to represent the Board[.]" *Id.* at 176, 952 P.2d at 1239.

17. We do not believe, under the circumstances, that a Board member should have been compelled to vote on HELCO's application, rather than allowing the member to abstain. We observe that HRS § 84–14(a)(1) (1993) states that "[n]o employee shall take any official action directly affecting a business or other undertaking

tures of both the Board and DHHL to confirm the rights of both agencies to groundwater, and the Board's right to repurchase the land;[18] 4) neglecting to acknowledge that Board is a ceded land trustee, pursuant to HRS § 171–58(g) (1993), and has certain corresponding obligations;[19] 5) refusing to remand the dispute to the BLNR after determining that there was no Board action; 6) declining to conclude that 1994 Haw. Sess. L. Act 270, a subsequent act which repealed HRS § 183–41, *see supra* note 5, eliminated the court's jurisdiction over HELCO's application;[20] 7) applying the 180–day provision of HRS § 183–41 to a contested case hearing;[21] 8) incorrectly ruling that 1961 Haw. Sess. L. Act 103 did not repeal the automatic approval provision of HRS § 183–41(a);[22] 9) mistakenly invalidating the Board's amended Minute Order No. 11 because HELCO never appealed from this order; and 10) concluding that amended Minute Order No. 11 was a final agency order. Finally, the Sierra Club and Na Leo Pohai submitted amicus curiae briefs generally supporting the policy considerations raised by the intervenors regarding the automatic approval provision.

in which he [or she] has a substantial financial interest." An employee is defined as "any nominated, appointed, or elected officer or employee of the State, *including members of boards.* ..." HRS § 84–3 (1993) (emphasis added).

**18.** We do not address Cooper's and Ratliff and KDC's argument that HELCO's application required the signatures of the Board and DHHL. As noted by HELCO, the Board determined that the 1992 application was complete on September 25, 1992, to which the intervenors never assigned any error. Moreover, HELCO's application appears to request only a change in the use of the land, and not to the underlying groundwater. *See, generally,* HRS chapter 174C (concerning water use permits). Accordingly, we decline to discuss this issue.

**19.** Cooper and Ratliff and KDC allege that the court erred in not ruling that the Board failed to meet its ceded land trustee obligations, but do not explicitly elaborate on how these obligations were not met. HRS § 171–58(g), which is cited by the intervenors, states that "[t]he department of land and natural resources shall notify the department of Hawaiian home lands of its intent to execute any new lease, or to renew any existing lease of water rights." It is not clear how this statute relates to a land use application. In addition, the intervenors quote *Pele Defense Fund v. Paty,* 73 Haw. 578, 605, 837 P.2d 1247, 1264, *cert. denied,* 507 U.S. 918, 113 S.Ct. 1277, 122 L.Ed.2d 671 (1993) ("Article XII, Section 4 [of the Hawai'i State Constitution] imposes a fiduciary duty on Hawai'i's officials to hold ceded lands in accordance with Section 59(f) trust provisions, and the citizens of the state must have a means to mandate compliance."), in support of their argument. Without directly addressing this issue, we observe that the Board did hold a contested case hearing and subsequent votes on the application. Thus, any ceded land trustee obligations could have been raised and considered.

**20.** Appellants Ratliff and KDC maintain that HRS § 183–41 was invalid and should not have been applied in this case because it was repealed

in 1994, before the contested case hearing on HELCO's application. HRS § 1–10 (1993), however, governs the effect of repeal on accrued rights and states:

The repeal of any law shall not affect any act done, or any right accruing, accrued, acquired, or established, or any suit or proceedings had or commenced in any civil case, before the time when the repeal takes effect.

In the instant case, HELCO submitted its application in 1992. Thus, pursuant to HRS § 1–10, the repeal of HRS § 183–41 did not affect HELCO's previously accrued rights.

**21.** Appellant DHHL contends that the 180–day deadline applies only to rulemaking and not to a contested case hearing. While this interpretation would better relate to the due process issues raised during the first agency appeal, this argument contradicts the express language of HRS § 183–41(a). That section provides that "when a *contested case hearing* is requested pursuant to chapter 91, the one hundred eighty days may be extended to an additional ninety days at the request of the applicant." (Emphasis added.). This provision demonstrates that HRS § 183–41 does apply in the case of a contested case hearing, contrary to DHHL's reading of the statute.

**22.** Appellants Ratliff and KDC assert that HRS § 183–41(a) is no longer valid because it was repealed by Act 103 in 1961. However, Act 103, section 17, provides that "all statutes, ... rules and regulations or parts thereof, *which are inconsistent with the provisions of this Act are hereby repealed.*" 1961 Haw. Sess. L. Act 103, § 17, at 90–91 (emphasis added). Repeal of a statute by implication, however, is not favored. *See State v. Gustafson,* 54 Haw. 519, 521, 511 P.2d 161, 162 (1973) ("repeals by implication are not favored"). Because Act 103 was enacted in 1961, and the legislature has subsequently amended HRS § 183–41 over 11 times since 1961, it would appear obvious that the legislature either did not intend to repeal this statute or has effectively re-enacted it. Accordingly, it cannot be implied that Act 103 repealed HRS § 183–41(a).

### III.

█ Cooper, Ratliff and KDC, Waimana, and DHHL challenge the court's jurisdiction to review the Board's vote and to order implementation of the approval provision of HRS § 183-41(a), arguing that there was no final order, conclusions and findings by the Board. In addition, they claim deprivation of their due process rights on the ground that the Board was not compelled to make findings and conclusions.

HRS § 91-14(a) governs appeals from a contested case hearing:

Any person aggrieved by a final decision and order in a contested case *or by a preliminary ruling of the nature that deferral of review pending entry of a subsequent final decision would deprive appellant of adequate relief* is entitled to judicial review thereof under this chapter.

(Emphasis added). Here, the Board stated in amended Minute Order No. 11 that "[t]he BLNR does not intend to deliberate further, or vote again, on this matter." Plainly, if the Board's action is not considered a "final decision" ending any further resolution of this issue by the Board, then it must be considered a preliminary ruling subject to judicial review. *See Public Access Shoreline Hawai'i v. Hawai'i County Planning Comm'n*, 79 Hawai'i 425, 433, 903 P.2d 1246, 1254 (1995) (noting that the agency had "rendered its final views for the purposes of judicial review" (citing HRS § 205A-29)); *see also In re Hawai'i Gov't Employees' Ass'n*, 63 Haw. 85, 89, 621 P.2d 361, 364 (1980) (upholding appellate jurisdiction where the agency's preliminary ruling ended the proceedings

with respect to a party seeking intervention in a contested case).

█ Similarly, the constitutional right of due process was adequately protected through the contested case hearing process and the subsequent votes by the Board.[23] In *Sandy Beach Defense Fund v. City Council*, 70 Haw. 361, 378, 773 P.2d 250, 261 (1989), this court explained that:

Determination of the specific procedures required to satisfy due process requires a balancing of several factors: (1) the private interest which will be affected; (2) the risk of an erroneous deprivation of such interest through the procedures actually used, and the probable value, if any, of additional or alternative procedural safeguards; and (3) the governmental interest, including the burden that additional procedural safeguards would entail.

*Id.* at 378, 773 P.2d at 261 (citations omitted). Applying this rule, *Sandy Beach Defense Fund* held that the appellants' due process rights were satisfied because they had received notice and had a sufficient opportunity to be heard on a bill before the Honolulu City Council. *See id.* Likewise, here, we conclude that the procedures followed, namely, the contested case hearing and the resulting Board votes, were sufficient to protect the intervenors' property interests from erroneous deprivation. Moreover, the dispositive issues in this case are not conditioned upon the findings and conclusions regarding the merits of the contested case, but, rather, on the legal question of whether the Board acted or rendered a decision at all. *See supra* note 23. Accordingly, the court appropriately limited its review to that issue.[24]

---

23. DHHL cites to *Application of Hawai'i Electric Light Co., Inc.*, 60 Haw. 625, 594 P.2d 612 (1979), for the proposition that

[t]he requirement that [the agency] set out its findings of fact and conclusions of law is no mere technical or perfunctory matter. The purpose of the statutory requirement that the agency set forth separately its findings of fact and conclusions of law is to assure reasoned decision making by the agency and enable judicial review of agency decisions.

*Id.* at 643, 594 P.2d at 623 (citations omitted). This basic statement of administrative law is unquestioned. In the instant case, however, the review is not of the Board's action, but, rather, on the limited issue of whether the Board acted

at all. In this analysis, there is no review of the substantive decision-making by the Board, for which findings and conclusions are statutorily mandated.

24. Similarly, the court did not err in ordering implementation of the automatic approval provision of HRS § 183-41(a), rather than remanding the case back to the Board for further deliberation. Ratliff and KDC, Waimana, and DHHL all maintain that the court should have remanded the case back to the Board for further deliberations following its conclusion that the Board failed to act. However, once there was a ruling that the Board failed to act pursuant to HRS § 183-41, there was nothing further to be deter-

## IV.

### A.

■ As stated earlier, HRS § 171–5 states that "[a]ny action taken by the board shall be by simple majority of the members of the board. Four members of the board shall constitute a quorum to do business." It is contended by the intervenors that, so long as a quorum is present, a majority of the members voting may render a binding decision of the Board. In opposition, HELCO and DLNR argue that there is no binding decision unless a majority of the entire board (4 of 6) agree, whether the entire board is present and voting, or whether only a quorum of four exists.

Under common law, a majority vote of a quorum is sufficient to approve a matter before an administrative or legislative body. *See DiGiacinto v. City of Allentown*, 486 Pa. 436, 406 A.2d 520, 522 (1979) ("Under the common law rule so long as a quorum is present at a meeting, all that is required is that the highest vote be equal to a majority of the quorum number, even though the highest vote constitutes only a plurality of all the legal votes cast."); *see generally* W.J. Dunn, Annotation, *What Constitutes Requisite Majority of Members of Municipal Council Voting on Issue*, 43 A.L.R.2d 698, 1955 WL 10397 (1955) ("Under the common law, where a legislative body such as a municipal council consisted of a definite number, a majority of the body constituted a quorum, and the vote of a majority of those present, provided, of course, there was a quorum, was sufficient for valid action by the body."). But, the common law has been modified in many states with statutes expressly prescribing what is a majority vote. *See, e.g., D.E.P. Resources, Inc. v. Planning Bd. of Monroe*, 131 A.D.2d 757, 516 N.Y.S.2d 954, 955 (1987) (the "common-law rule was abrogated in New York" by a statute that states that "not less than a majority of the whole number may perform and exercise such power, authority or duty"); *Ram Dev. Co. v. Shaw*, 309 Minn. 139, 244 N.W.2d 110, 115 (1976) (observing other case law, but noting that the governing statute required "two-thirds of all members").

■■■ We believe that the plain language of HRS § 171–5 modifies the common law rule by requiring a majority vote of the *entire* board, regardless of the number present and voting. "When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is obtained primarily from the language contained in the statute itself." *Iddings v. Mee–Lee*, 82 Hawai'i 1, 6, 919 P.2d 263, 268 (1996). "Where the language of a statute is plain and unambiguous, our only duty is to give effect to the statute's plain and obvious meaning." *Id.* at 7, 919 P.2d at 269.

### B.

HRS § 171–5 states that any Board action must be taken by the vote of a "simple majority of the members of the board." The Board consists of six members. *See* HRS § 171–4. Thus, as a simple majority of six is four, it is apparent that the legislature rejected the common law approach and required a majority of the entire board to authorize an action.

The sentence following in HRS § 171–5 allows for the conduct of business if there is a quorum of four members. Construing the two sentences and giving effect to each, we conclude that, under HRS § 171–5, a quorum of the Board is sufficient to conduct business, but any Board action must be authorized by a majority of the total membership of the Board. To hold otherwise would render the sentences redundant, *i.e.*, to "conduct business" would also mean "taking action." *See Coon v. City and County of Honolulu*, 98 Hawai'i 233, 259, 47 P.3d 348, 378 (2002) ("[C]ourts are bound, if rational and practicable, to give effect to all parts of a statute, and ... no clause, sentence, or word shall be construed as superfluous, void, or insignificant if a construction can be legitimately found which will give force to and preserve all words of the statute." (Internal quotation marks and citations omitted.)).

mined, inasmuch as in the absence of a decision "the owner may automatically put the owner's

land to the use or uses requested in the owner's application." HRS § 183–41(a).

Additionally, there is no expression in the statute that a quorum to do business allows for a reduced number of votes in establishing the majority necessary for Board action. If the legislature had intended that action could be taken by a majority of the members present and voting rather than by a "simple majority of the *members of the board*" (emphasis added), then the statute could have expressly provided for that alternative. *See Mann v. Key*, 345 So.2d 293, 295 (Ala.1977) ("Our decision is based upon the requirement of the statute that the vote must be by a 'majority of the total membership of the governing body.' "); *State of Tennessee v. Torrence*, 203 Tenn. 175, 310 S.W.2d 425, 427 (1958) ("Thus as we see it under the language used by this constitutional provision here a two-thirds vote of the 'local legislative body' would not be two-thirds of those present or two-thirds of the members voting but would be two-thirds of this legislative body[.]")

We note that the legislature has generally adopted the foregoing standard in HRS § 92–15 (1993) for boards and commissions. HRS § 92–15 pertains to the number of votes necessary to constitute an act in the absence of a specific applicable statute or ordinance. It states that "the concurrence of a majority of all the members *to which the board or commission is entitled* shall be necessary to make any action of the board or commission valid[.]"[25] (Emphasis added.) In this case, the court relied upon an attorney general's opinion, A.G. Opinion 85–11, which in analyzing this statute opined that "[t]he applicability of the [common-law] rule, however, has been generally limited in more recent times by statutes which prescribe specific bases upon which to calculate and determine the requisite majority to validate action by a body[.]"

Thus, it is apparent that in HRS § 171–5 the legislature made a conscious decision to reject the common law rule and to mandate

that the majority necessary to take action must be measured by the entire board, and not merely by the members present. In general, the cases cited for the contrary position are distinguishable because of the differing language of the governing statute, *see, e.g., Fitanides v. City of Saco*, 684 A.2d 421, 423 (Me.1996) (the governing statute stated "a simple majority of members present and voting shall be sufficient for the passage of a motion"); *Clausing v. State*, 90 Wash.App. 863, 955 P.2d 394, 399 (1998) ("An affirmative vote of a simple majority of the members present at a meeting or hearing shall be required for the board to take any official action."), or the lack of a statute contravening the common law; *see Tsao v. Immigration & Naturalization Serv.*, 538 F.2d 667, 669 (5th Cir.1976) (noting the codification of previously existing common law and stating "in the absence of a contrary statutory provision, a majority of a quorum constituted" a majority to approve an act).

## V.

▮ DHHL argues that the recusal of one of the Board members can be likened to a temporary resignation, thus reducing the total number of Board members. In *Lymer v. Kumalae*, 29 Haw. 392 (1926), this court extensively reviewed case law regarding majority voting and abstentions, and held that a majority of the board is a majority of the members of the board "as constituted by law[,]" *see id.* at 414, irrespective of the number of members present at the time of the vote. In doing so, this court explained that

[a] different construction would be fraught with serious danger. It is conceivable that all the members of the board except two, or even one, might resign or leave the Territory or die. *The respondent's contention would lead to the conclusion that the two, or one, remaining would have the power to administer the affairs of*

25. DHHL contends that HRS § 171–5, which refers to "a simple majority," should be differentiated from HRS § 92–15, which contains the phrase "all the members of the board[,]" and, thus, the court incorrectly construed HRS § 171–5. We cannot agree with this argument, however, inasmuch as the legislature could have used the words a "simple majority of the members present and voting" if it had intended to convey such a meaning. Instead, the legislature employed the words a "simple majority of the members of the board[,]" which means a majority of all the members of the Board to which the Board is statutorily entitled.

*the municipality and bind it in the matters of the most serious consequence.*

*Id.* at 412 (emphasis added).[26] Recognizing the implications of this holding, it was explained that

> [w]e are not unmindful that the view we take of the statute may also lead to serious results. If a majority of all the members of the board should for any reason cease to be members, thus making a quorum impossible and therefore making it impossible to fill the vacancies, we know of no statutory provision by which the legislative branch of the municipal government could continue to function. This, however, is a matter of legislative concern and cannot influence us in placing the construction on the statute which we think it reasonable bears.

*Id.* at 419–20. Similarly, a number of courts have held that an abstention, disqualification, or sickness does not reduce the total number of members on a board in terms of voting requirements. *See City of Alamo Heights v. Gerety,* 264 S.W.2d 778, 779 (Tex.Ct.App. 1954) ("Some statutes in stating a necessary vote, contemplate an irreducible number of positions, a full and unreduced complement of the total body. That result is achieved in the case of a statute which refers not only to all the members, but also adds words to show it speaks of the total number of positions which always remains constant."); *Rockland Woods, Inc., v. Incorporated Village of Suffern,* 40 A.D.2d 385, 387, 340 N.Y.S.2d 513 (N.Y.App.Div.1973) ("[I]t is our opinion that three favorable votes are required to constitute a majority of a five-member board ... and that the absence or abstention of a member does not dispense with or lessen that

requirement." (Citations omitted.)); *see generally* J.R. Kemper, Annotation, *Abstention from Voting of Member of Municipal Council Present at Session as Affecting Requisite Voting Majority,* 63 A.L.R.3d 1072, 1975 WL 37107 (1975); *but see Clark v. City Council of Waltham,* 328 Mass. 40, 101 N.E.2d 369, 370 (1951) (where five members abstained, four voted in favor, and one against, the court held that "a majority of a council or board is a quorum and a majority of the quorum can act"); *State ex rel. Wilson v. Willis,* 47 Mont. 548, 133 P. 962 (1913) (the phrase " 'a majority of the members' could mean more than a majority of those constituting the actual membership of the body at the time; so that, if the full membership is sixteen but at a given time has been in fact reduced by the resignation of one, there are but fifteen members").

Accordingly, we reaffirm *Lymer,* and hold that, unless otherwise prescribed, the total number of members on a board is not reduced by an abstention, resignation or vacancy.

## VI.

Insofar as a majority of the Board did not affirmatively approve or disapprove of HELCO's application within the time established, we hold that the Board failed to render a "decision" so as to avoid the 180–day default mechanism of HRS § 183–41.[27] As stated earlier, HRS § 183–41(a) allows the applicant to implement the use requested in the application if the department "fail[s] to give notice, hold a hearing, and *render a decision.* ..." (Emphasis added.) There is no question that the Board issued a public

---

26. We recognize that the analysis used in *Lymer* is not directly analogous insofar as HRS § 171–5 also states that "[f]our members of the board shall constitute a quorum to do business." Thus, if four members were to resign, leave, or die, there would be no quorum and the Board would be unable to take any action.

27. Although Act 270 repealed HRS § 183–41 in 1994, a similar section replaced the repealed provisions. HRS § 183C–6(b) (Supp.2002) provides as follows:

> The department shall render a decision on a completed application for a permit within one-hundred-eighty days of its acceptance by the department. *If within one-hundred-eighty days*

*after acceptance of a completed application for a permit, the department shall fail to give notice, hold a hearing, and render a decision, the owner may automatically put the owner's land to the use or uses requested in the owner's application.* When an environmental impact statement is required pursuant to chapter 343, or when a contested case hearing is requested pursuant to chapter 91, the one-hundred-eighty days may be extended an additional ninety days at the request of the applicant. Any request for additional extensions shall be subject to the approval of the board.

(Emphasis added.).

notice and held a contested case hearing. The Board also voted on the application. The issue, therefore, is whether the vote conducted by the Board constituted a "decision" pursuant to HRS § 183–41(a).

### A.

The parties to this case acknowledge that there is no Hawaiʻi case law interpreting the default mechanism of HRS § 183–41. Under the plain language of HRS § 183–41, the Board must "render a decision." An action such as that referred to in HRS § 171–5 is defined as a "deliberative or authorized proceeding: . . . an act or decision by an executive or legislative body (as of a government or a political party)[.]" *Webster's Third New Int'l Dictionary* 21 (1986). Similarly, a decision is the "act of deciding; *specif: the act of settling or terminating* (as a contest or controversy) by giving judgment[.]" *Id.* at 585 (emphasis added). The definition of "action," then, is subsumed in the term "decision."

A decision thus connotes the act of deciding or settling a controversy or question. Hence, a vote that does not decide the controversy presented to the Board as to HELCO's application does not constitute a decision, within the plain meaning of the term "decision." For the reasons stated *supra*, HRS § 171–5 mandates that a vote of a majority of the entire board is necessary for the Board to act; hence, a vote of less than such a majority does not amount to Board action. In the absence of a board action, the question of whether to approve or disapprove of the application was not decided. Whereas that question was not decided, no "decision" under HRS § 183–41 was rendered. As HRS § 183–41 plainly sets out, the failure to render a decision within the relevant time period results in the applicant subjecting its land to the use applied for.

This conclusion is supported by the legislative history of HRS § 183–41, indicating that the legislature meant the requirements of HRS § 171–5 to apply in order for the Board to have rendered a decision. *See State v. Entrekin*, 98 Hawaiʻi 221, 227, 47 P.3d 336, 342 (2002) ("Although we ground our holding

in the statute's plain language, we nonetheless note that its legislative history confirms our view." (Citations omitted.)). In 1957, the Senate Judiciary Committee recommended amending a proposed house bill, stating:

> Certain changes have been made in the provisions of H.B. 3, H.D. 1 to meet objections raised by the administration to the closely related S.B. 3 which was vetoed. Your Committee is informed that the suggested changes were the result of conversations held with the governor by the minority leader and speaker of the house and have been checked by the attorney general and the president of the board of agriculture and forestry. These major changes are:
>
> (1) Addition of the last two provisions at the end of the first paragraph of section 2 of the amended draft. *The first proviso allows the landowner to make application for a change in use, and sets a time limit in which the boards must act. If no action is taken within the time limit the owner may put the land to the use requested.*

Sen. Stand. Comm. Rep. No. 740, in 1957 Senate Journal, at 641 (emphasis added). Through the use of the words "action" and "decision" in HRS § 183–41, and the language in HRS § 171–5 requiring that "[a]ny action taken by the board shall be by a simple majority of the members of the board[,]" it is evident that the legislature intended that the decision-making process required "action" taken by a majority of the entire Board. *See* HRS § 1–16 ("Laws in *pari materia*, or upon the same subject matter, shall be construed with reference to each other."). Consequently, to hold that a vote of less than a majority of the entire board constitutes a "decision" under HRS § 183–41, would be inconsistent with the directive in HRS § 171–5 that Board action requires the affirmative vote of a "simple majority of the board." [28]

### B.

Hence, it has been held that a tie vote or a less-than-majority vote results in agency in-

---

28. By the same token, were the vote reversed, the same argument would allow an application to be approved by a vote of less than a majority of the members of the Board.

action, thus triggering automatic approval of an application. *See Younger v. Tahoe Regional Planning Agency*, 516 F.2d 215, 218 (9th Cir.1975) (where the automatic approval statute required the agency to "take action[,]" the court distinguished other cases because of the plain language of the statute and held that the failure to muster a majority vote to either approve or reject the application resulted in an automatic approval); *Squicciarini v. Planning Bd. of Chester*, 48 A.D.2d 687, 367 N.Y.S.2d 845 (1975), *aff'd*, 38 N.Y.2d 958, 384 N.Y.S.2d 152, 348 N.E.2d 609 (1976) (where the statute at issue required action by a majority of the members of the board, application for special permit was automatically approved when only three members of a seven member board voted on a motion to deny an application); *D.E.P. Resources, Inc. v. Planning Bd. of Monroe*, 131 A.D.2d 757, 516 N.Y.S.2d 954, 955–56 (N.Y.App.Div.1987) (application deemed approved by the inaction of board where two out of five members voted to deny the application and the court determined that at least three members of the board must concur for there to be a valid exercise of the board's power).

■ As to opposing cases,[29] we must decline to follow them. We are faced with specific statutes, the "statutory language [of which] is plain and unambiguous[; thus] our sole duty is to give effect to [their] plain and obvious meaning." *In re Tax Appeal of Lower Mapunapuna Tenants Ass'n*, 73 Haw. 63, 68, 828 P.2d 263, 266 (1992) (ellipsis points in original) (citations omitted). HRS § 183–41 manifestly declares that if after 180 days of the receipt of the application "the department shall fail to ... render a decision ... the owner may automatically put the owner's land to the use or uses requested...." Reading HRS § 183–41 in concert with HRS § 171–5, we hold, *see* discussion *supra*, that the Board must act in order to render a decision, and an action of the Board requires a simple majority vote of the members of the board, that is, the affirmative vote of at least four members. If the legislature had intended a contrary result then it could have—and we assume it would have—employed language limiting the application of the 180–day approval rule.

The Ninth Circuit followed similar reasoning in *Younger*, observing that "[a]lthough we find California's argument extremely appealing on an emotional level, it simply does not take into account the plain meaning of the [statute] and the intent of its architects." 516 F.2d at 218. That federal court held that the plain language of the statute in question required a "final action" which did not occur unless the agency "1) approve[d] the permit[;] 2) require[d] modification[;] or 3) reject[ed] the permit." *Id.* at 219. In conclusion, the Ninth Circuit noted that the statute was "not the result of a court imposed interpretation, but of deliberate action by the legislatures.... This court is not empowered to rewrite [the statute]." *Id.* at 220. As the

---

29. *See Tall Trees Construction Corp. v. Zoning Bd. of Appeals of Huntington*, 97 N.Y.2d 86, 735 N.Y.S.2d 873, 761 N.E.2d 565, 568–69 (2001) (distinguishing *Squicciarini* and holding that the plain language of the statute required a majority vote to grant a variance application and the failure to acquire a majority vote was, in effect, a denial of the application); *Penllyn Lands v. Board of Supervisors of Lower Gwynedd Township*, 162 Pa.Cmwlth. 14, 638 A.2d 332, 336 (1994) (a "vote of less than the required majority of its members, cannot be considered to be a failure to render a decision for the purpose of determining a deemed approval" as "the Board took an action and communicated its decision to [the applicant] in a timely manner[.]"); *Committee for a Rickel Alternative and Linden Merchants Ass'n v. City of Linden*, 111 N.J. 192, 543 A.2d 943, 946 (1988) (the clear intent of the automatic approval statute was to "require expeditious disposition of appeals[,]" and the "fact that the 'decision' reached was inconclusive ... does not serve to convert the Council's attempted action into 'inaction' "); *Huck v. Inland Wetlands and Watercourses Agency*, 203 Conn. 525, 525 A.2d 940, 945 (1987) (noting that "[t]he requirement that the agency take 'action' within the prescribed 65 day period is to insure prompt and expeditious action for the protection of the applicant" and holding that a tie vote was such an action); *Giant Food Stores v. Zoning Hearing Board*, 93 Pa.Cmwlth. 437, 501 A.2d 353, 354 (1955) ("In accordance with settled principle that a tribunal's divided vote confirms the status quo, this court's conclusion is that a zoning hearing board's one-to-one vote has the legal effect of denying the variance request."). These cases may be distinguishable based on, *inter alia*, the language of the laws involved, the legislative history of the laws construed, or the nature of review by the relevant governmental body.

*Younger* court suggested, the remedy for a contrary outcome lies not with the judicial branch, but with the legislative branch that drafted the statute. *See id.* at 220.

Several of the intervenors cite to two commentators who assert that automatic approval provisions were intended to curb agency delay, rather than to allow an applicant to succeed should the agency deadlock or otherwise fail to render a final decision. *See* G. Brooker and K. Cole, *Automatic Approval Statutes: Escape Hatches and Pitfalls,* 29 Urb. Law. 439, 456 (1997); *see also Bickel v. City of Piedmont,* 16 Cal.4th 1040, 68 Cal. Rptr.2d 758, 946 P.2d 427, 432 (1997) (to prevent agency "foot-dragging"); *Huck,* 525 A.2d at 945 ("to insure prompt and expeditious action"). However, we must reject Brooker's and Cole's approach inasmuch as it is not supported by the language of HRS § 183–41 or any legislative history.

HRS § 183–41 creates a situation in which a petitioner's application may be effectuated because the Board is unable to affirmatively approve or reject an application, but that is a result of the statutory framework adopted by the legislature. It is beyond the power of this court to legislatively "correct" HRS § 183–41 in order to prevent such a result. If the automatic approval statute should operate otherwise, as argued by the intervenors, then it is within the legislature's prerogative to modify HRS § 183–41 as it did with respect to HRS § 171–5. *See supra* note 10 (noting that the legislature modified HRS § 171–5 to allow for a majority vote by the members present and voting in regards to applications under HRS § 183C–6(b)).

## VII.

Accordingly, we affirm the February 11, 1998 final judgment which granted HELCO's application.[30] Our disposition makes it unnecessary to consider the remaining contentions raised by the parties.[31]

---

**30.** On July 3, 2001, the court granted a HRCP Rule 60(b)(6) motion for post-conviction relief, but reserved disposition of the motion until the conclusion of this appeal. Because the merits of the HRCP Rule 60(b) motion are not presented to this court on appeal, this opinion does not affect the court's jurisdiction to resolve the HRCP Rule 60(b) motion on remand.

**31.** Inasmuch as this disposition is dispositive of the case, it is unnecessary to address the contention that the Board lacked jurisdiction to amend Minute Order No. 11, and the argument that the court erred in invalidating the Board's amended Minute Order No. 11. *See* Part II.